KENNETH ROBINSON, AN INFANT BY HIS PARENT AND GUARDIAN *AD LITEM*, ERNESTINE ROBINSON, *ET AL.* PLAINTIFFS-RESPONDENTS, v. WILLIAM T. CAHILL, GOVERNOR OF THE STATE OF NEW JERSEY, *ET AL.* DEFENDANTS-APPELLANTS.

Argued November 24, 1975—Decided January 30, 1976.

──────

*Mr. Lewis B. Kaden,* Special Council to the Governor, argued the cause for appellant Governor of the State of

New Jersey. (*Mr. Kaden*, of counsel and on the brief; *Ms. Judith Nallin* and *Mr. Arthur Winkler*, Assistant Counsel to the Governor, on the brief).

*Mr. Stephen Skillman*, Assistant Attorney General, argued the cause for appellants Treasurer of the State of New Jersey, Commissioner of Education of the State of New Jersey, New Jersey State Board of Education, and State of New Jersey (*Mr. William F. Hyland*, Attorney General of New Jersey, attorney; *Mr. Skillman*, of counsel and on the brief; *Ms. Jane Sommer*, Deputy Attorney General, on the brief).

*Mr. David Goldberg* argued the cause for appellants President of the Senate of the State of New Jersey and the Senate of the State of New Jersey. (*Messrs. Warren, Goldberg* and *Berman*, attorneys).

*Mr. Jack Borrus* argued the cause for appellants Speaker of the General Assembly of the State of New Jersey and the General Assembly of the State of New Jersey (*Messrs. Borrus, Goldin and Foley*, attorneys; *Mr. Borrus*, of counsel; *Mr. David M. Foley*, on the brief).

*Mr. Harold J. Ruvoldt, Jr.* argued the cause for respondents (*Messrs. Ruvoldt and Ruvoldt*, attorneys and Special Counsel to *Mr. Dennis L. McGill*, Corporation Counsel of the City of Jersey City, *Mr. Frank H. Blatz, Jr.*, Corporation Counsel of the City of Plainfield, *Mr. Joseph LaCava*, Corporation Counsel of the City of Paterson, and *Mr. Julius Fielo*, Corporation Counsel of the City of East Orange).

*Mr. Paul L. Tractenberg* and *Mr. David G. Lubell*, of the New York bar, argued the cause for *amici curiae* Education Committee, Newark Chapter, National Association for the Advancement of Colored People and American Civil Liberties Union of New Jersey (*Messrs. Tractenberg, Lubell, and Frank Askin*, attorneys; *Mr. Stephen Eisdorfer*, on the brief).

*Mr. William Zaino* argued the cause for *amicus curiae* New Jersey School Boards Association.

*Mr. Cassel R. Ruhlman, Jr.* argued the cause for *amicus curiae* New Jersey Education Association (*Messrs. Ruhlman and Butrym,* attorneys).

*Mr. Andrew T. Berry* argued the cause on behalf of *amici curiae* Township of Livingston and the Boards of Education of the School Districts of Montclair, Berkeley Heights, Chatham Township, New Providence, Rumson, Sandyston-Walpack, Summit and Millburn, Avon-by-the-Sea, Belmar, Englewood, Mendham Township, and the City of Englewood and the Mayor of the Borough of Carlstadt (*Messrs. McCarter and English,* attorneys for *amici curiae* Township of Livingston and the Boards of Education of the School Districts of Montclair, Berkeley Heights, Chatham Township, New Providence, Rumson, Sandyston-Walpack, Summit and Millburn; *Mr. Berry* of counsel and on the brief; *Mr. Peter F. Shebell, Jr.,* attorney for Avon-by-the-Sea and Belmar; *Mr. Walter T. Wittman,* attorney for *amicus curiae* Board of Education of City of Englewood; *Mr. Arthur W. Lesemann,* attorney for *amicus curiae* City of Englewood; *Messrs. Mills, Doyle, Hock and Murphy,* attorneys for *amicus curiae* Board of Education of Township of Mendham; *Mr. Paul S. Barbire* filed a brief on behalf of *amicus curiae* Mayor of the Borough of Carlstadt).

*Mr. Robert T. Pickett* and *Mr. David C. Long* of the Illinois bar argued the cause for *amicus curiae* The Education Reform Project of The Greater Newark Urban Coalition (*Messrs. Pickett and Jennings,* attorneys; *Mr. Pickett,* of counsel and on the brief; *Mr. Long,* on the brief).

*Mr. Morton Feldman* submitted a memorandum on behalf of *amici curiae* Pleasantville Taxpayers Association, Wey-

mouth Taxpayers Association, Association of Concerned Citizens of Vineland and. Gilbert Cramer.

PER CURIAM. The earlier history of this protracted litigation appears elsewhere in our reports.[1] It need not be restated here. On September 29, 1975, there was enacted into law a statute known as the Public School Education Act of 1975, c. 212, L. 1975, N. J. S. A. 18A:7A–1 et seq.). Immediately following its passage, motions were addressed to this Court by a number of different parties in the cause. The various forms of relief sought by these motions all implicated one underlying issue: was or was not the Act of 1975 constitutional? We hesitated to entertain the motions. No lower court determination of this underlying issue was before us for review; the parties had had no opportunity to avail themselves of an evidentiary hearing at which a record could be made; a judgment by us might savour somewhat of an advisory opinion. These considerations, however, were felt to be outweighed by the desirability of reaching a speedy decision as to the constitutionality of the enactment — at least when examined *facially*.[2] We thought it would

---

[1] Judge Botter's original opinion is reported at 118 *N. J. Super.* 223 (Law Div. 1972) and is supplemented by a further opinion in 119 *N. J. Super.* 40 (Law Div. 1972). The opinions and orders of this Court, handed down after our original grant of certification, follow: 62 *N. J.* 473 (1973) (*Robinson* I); 63 *N. J.* 196 (1973) (*Robinson* II); 67 *N. J.* 35 (1975) (*Robinson* III) and 69 *N. J.* 133 (1975) (*Robinson* IV).

[2] We were urged to defer ruling even upon the facial constitutionality of the Act until after the promulgation of administrative regulations. These have now been promulgated. *N. J. A. C.* 6:8–1.1, *et seq.*, (approved January 7, 1976). Whether they are valid and adequate must await later determination and in no event can directly affect the constitutionality of the Act.

We were also urged to postpone ruling upon the validity of this Act until it had been fully funded. This proposal is also unacceptable. We should and do proceed upon the assumption that complete funding will be forthcoming to furnish the necessary means to put the statute into full operation. The determination we reach —

be possible — and if so, highly desirable — to decide at once whether the statute, on its face, did or did not meet constitutional requirements. Parenthetically, we note that whether it may or may not pass constitutional muster as applied in the future to any individual school district at any particular time, must quite obviously await the event. Only in the factual context then presented and in the light of circumstances as they may then appear could such a determination be made.

Accordingly we address ourselves to the issue as to whether, on its face, the 1975 Act is or is not constitutional.

I

It is, initially, of vital importance to note that this is the first time in the course of this litigation that we have had an opportunity to consider a plan intended to meet all aspects of a thorough and efficient education. *Robinson* I, as the opening sentence of the opinion makes clear, involved only "the constitutionality of statutes providing for the *financing* of elementary and secondary schools." [62 *N. J.* 473, 480; emphasis supplied]. It is of course true that the opinion says much that bears significantly upon aspects of the problem of public education other than the fiscal one. And although we have not hitherto been asked to examine the adequacy of the educational system in this State in other than financial terms, we have been constantly mindful that money is only one of a number of elements that must be studied in giving definition and content to the constitutional promise of a thorough and efficient education. Thus in *Robinson* IV we said,

---

that the statute is facially constitutional — rests upon this assumption. Put more plainly, the 1975 Act, absent funding, could never be considered a constitutional compliance with the 1875 amendment to the New Jersey Constitution — adjuring the legislative establishment of a system of thorough and efficient education.

[A] multitude of other [non-fiscal] factors play a vital role in the educational result — to name a few, individual and group disadvantages, use of compensatory techniques for the disadvantaged and handicapped, variation in availability of qualified teachers in different areas, effectiveness in teaching methods and evaluation thereof, professionalism at every level of the system, meaningful curricula, exercise of authority and discipline, and adequacy of overall goals fixed at the policy level. [69 *N. J.* 133, 141]

We are now called upon to examine a legislative proposal that at once seeks to define the constitutional promise, identify the components of which it consists, establish a procedural mechanism for its implementation and afford the financial means necessary for its fulfillment. We approach our analysis having in mind the presumption of validity which accompanies the legislative act.

## II

In *Robinson* I we pointed out that the State had never defined or spelled out the content of the educational opportunity required by the Constitution, and we indicated that this must be done so that "in some discernible way" the scope of this obligation would be made apparent. 62 *N. J.* at 516, 519. This, as we have noted, the Legislature has now undertaken to do. The goal of a thorough and efficient education and the principal elements of which it must consist are explicitly stated:

The goal of a thorough and efficient system of free public schools shall be to provide to all children in New Jersey, regardless of socioeconomic status or geographic location, the educational opportunity which will prepare them to function politically, economically and socially in a democratic society. [*N. J. S. A.* 18A:7A-4]

A thorough and efficient system of free public schools shall include the following major elements, which shall serve as guidelines for the achievement of the legislative goal and the implementation of this act:

a. Establishment of educational goals at both the State and local levels;

b. Encouragement of public involvement in the establishment of educational goals;

c. Instruction intended to produce the attainment of reasonable levels of proficiency in the basic communications and computational skills;

d. A breadth of program offerings designed to develop the individual talents and abilities of pupils;

e. Programs and supportive services for all pupils especially those who are educationally disadvantaged or who have special educational needs;

f. Adequately equipped, sanitary and secure physical facilities and adequate materials and supplies;

g. Qualified instructional and other personnel;

h. Efficient administrative procedures;

i. An adequate State program of research and development; and

j. Evaluation and monitoring programs at both the State and local levels. [*N. J. S. A.* 18A:7A-5]

To the "major elements" listed above should be added the requisite of sufficient fiscal support. Perhaps this is implied in what is quoted above. In any event it is dealt with at length in a later portion of the statute[3] and is discussed below.

Together with these legislative statements of educational aims and of the ingredients of which a thorough and efficient education must consist, attention should be directed to one of the findings appearing in a prefatory portion of the Act. This reads as follows:

Because the sufficiency of education is a growing and evolving concept, the definition of a thorough and efficient system of education and the delineation of all the factors necessary to be included therein, depend upon the economic, historical, social and cultural context in which that education is delivered. The Legislature must, nevertheless, make explicit provision for the design of State and local systems by which such education is delivered, and should, therefore, explicitly provide after 4 years from the effective date of this act for a major and comprehensive evaluation of both the State and local systems, and the sufficiency of education provided thereby; [*N. J. S. A.* 18A:7A-2, subd. a(4)]

This statement reveals a perceptive recognition on the part of the Legislature of the constantly evolving nature of the

---

[3] *N. J. S. A.* 18A:7A-17 *et seq.*

concept being considered. It manifests an awareness that what seems sufficient today may be proved inadequate tomorrow, and even more importantly that only in the light of experience can one ever come to know whether a particular program is achieving the desired end.

While the Constitution squarely places the responsibility for the maintenance and support of free public schools upon the Legislature, the administrative aspect of this obligation has in fact historically been delegated in large part to a system of local school districts, operating chiefly through local school boards. Furthermore the fiscal aspect of the obligation has long been met in significant part by taxes raised by these same districts. All of this is well known and discussed at length in *Robinson* I, 62 *N. J.* at 505–12. This sharing of the financial responsibility as between the State and these local districts was there held to be constitutionally permissible. 62 *N. J.* at 510. The Act of 1975 continues this plan of large delegated responsibility with the resultant sharing of administrative duties and fiscal support.

In furtherance of the Legislature's obvious commitment to the belief that a sound educational system will be more or less constantly changing and growing, provision is made in the Act for a rather elaborate monitoring arrangement. The responsibilities are here again shared by State and local authorities. *N. J. S. A.* 18A:7A–8 to 12. We draw especial attention to *N. J. S. A.* 18A:7A–10, which reads as follows:

For the purpose of evaluating the thoroughness and efficiency of all the public schools of the State, the commissioner, with the approval of the State board and after review by the Joint Committee on the Public Schools, shall develop and administer a uniform, Statewide system for evaluating the performance of *each* school. Such a system shall be based in part on annual testing for achievement in basic skill areas, and in part on such other means as the commissioner deems proper in order to (a) determine pupil status and needs, (b) ensure pupil progress, and (c) assess the degree to which the educational objectives have been achieved. [Emphasis supplied]

This is an important and potentially far-reaching provision. It recognizes that in seeking to achieve educational excellence and in attempting to gauge the success of any such effort, each school district must be examined as a separate unit. As we have seen above, the Legislature has enumerated the components of which it believes a thorough and efficient education must consist, these, including implementation at the local level, *N. J. S. A.* 18A:7A–7, to be used as guidelines for the achievement of the legislative goal. In thus providing that local boards shall establish particular educational goals, objectives and standards, and that the system of monitoring and evaluation shall treat school districts as individual units, the Legislature is implicitly acknowledging the diversity that will inevitably exist among these separate establishments. The configuration of the components mentioned above, considered both qualitatively and quantitatively, that will produce a sufficiently fine educational opportunity in one district, will inevitably be different from that required in others. Not alone for this reason, we think that the legislative provisions for evaluating achievement — here set forth in broad outline — have been well and thoughtfully formulated.

Crucial to the success of the legislative plan, as well as to the argument that the statute is facially constitutional, are three particular sections of the Act: *N. J. S. A.* 18A: 7A–14, 15 and 16. These provisions allocate to the Commissioner of Education and to the State Board of Education a two-fold continuing responsibility: first, to maintain a constant awareness of what elements at any particular time find place in a thorough and efficient system of education, as this concept evolves through the inevitably changing forms that it will take in the years to come; second, to insure that there be ever present, sufficiently competent and dedicated personnel, adequately equipped, to guarantee functional implementation, so that over the years and throughout the State each pupil shall be offered an equal oppor-

tunity to receive an education of such excellence as will meet the constitutional standard.

Pursuant to this allocation of responsibility, the Commissioner is required to review the results of the monitoring and evaluation system mentioned above. Upon detecting an inadequacy he must direct the local board of education to prepare forthwith a plan designed to correct and remedy the failure that has been identified. Such plan will be submitted to him for approval. If approved, the plan will be implemented "in a timely and effective manner." *N. J. S. A.* 18A:7A–14. Should the proposal not be approved, the Commissioner is directed to order the local board to show cause why there should not be a plenary hearing held before him to determine whether or not corrective action is necessary. If such a hearing is held, and the Commissioner decides that in fact such action is needed, he is then authorized "to order necessary budget changes within the school district," or "in-service training programs for teachers and other school personnel, or both." *N. J. S. A.* 18A:7A–15. If these steps in turn prove insufficient, the Commissioner may then formally bring the matter to the attention of the State Board in order that it may take further action. The statutory power and obligation of the Board upon such an occasion is stated thus:

The State board, on determining that the school district is not providing a thorough and efficient education, notwithstanding any other provision of law to the. contrary, shall have the power to issue an administrative order specifying a remedial plan to the local board of education, which plan may include budgetary changes or other measures the State board determines to be appropriate. [*N. J. S. A.* 18A:7A–15]

Should the local board fail or refuse to comply with such an administrative order, then the State Board shall apply to the Superior Court by action in lieu of prerogative writ for an order directing such compliance.

What we have said may be summarized. The Constitution imposes upon the Legislature the obligation to ". . . provide

for the maintenance and support of a thorough and efficient system of free public schools . . . ." The imposition of this duty of course carries with it such power as may be needed to fulfill the obligation. The statutory language quoted and discussed above constitutes a delegation of this power to the State Commissioner of Education as well as to the State Board of Education to see that the constitutional mandate is met. They have, for this purpose, been made legislative agents. They have received a vast grant of power and upon them has been placed a great and ongoing responsibility.

█ It has been suggested that the power, given both to the Commissioner and to the State Board of Education, to direct "budgetary changes" does not include the power to compel an increase in a local school budget above that fixed by the local authorities. We cannot accept this limitation; to do so would be to emasculate, perhaps fatally, what we believe to have been the legislative scheme. It would thwart the State Board's authority to compel a local district to meet the financial commitments necessary to satisfy the thorough and efficient standards. Cases such as *Board of Education, East Brunswick Township v. Township Council, East Brunswick Township,* 48 *N. J.* 94 (1966) and *Board of Education of Elizabeth v. City Council of Elizabeth,* 55 *N. J.* 501 (1970) are readily distinguishable. In those cases we examined, respectively, Type I and Type II school districts (*N. J. S. A.* 18A:9–2 and 3), and in each case suggested — although the point was not really argued in either suit — that the budget determination reached by the Commissioner should not exceed what had been first fixed by the local board of education. But these cases are in no event controlling precedents as to the matter now before the Court. They dealt with the problem of fixing and adopting the school budget for a particular year. In such cases the Commissioner acts somewhat as an arbitrator reviewing competing claims. Depending upon the type of district involved, he may be called upon to evaluate the conflicting

claims and assertions of the local board of education, the municipal governing body, the board of school estimate and the voters of the school district. He is required to act speedily; there is little time for deliberation.

On the other hand, under the Act of 1975 the Commissioner does not in any sense stand as an arbitrator among local groups, nor does he wait for the matter to be presented to him. Directly or indirectly, he is the initiator. His study and review of the results of the tests and other monitoring procedures that are prescribed, and his consequent action pursuant to such study and review are vastly different from the task he undertakes in putting into final form the terms of an annual budget. These are separate and quite distinct responsibilities that have been allocated to the Commissioner. They call upon him to follow quite separate procedures. For example, his function under the new Act is by no means confined to budget analysis. A failure to meet minimal educational standards may, perhaps more often than not, lie elsewhere than in matters of finance. Thus the Commissioner's study and review are not to be confined to a school district's financial support. There must also be included a consideration of the other elements set forth by the Legislature in *N. J. S. A.* 18A:7A–5. Account must be taken, as well, of such other factors as may from time to time emerge and assume significance as the result of ongoing study and further experience. But where it is clear that an inadequacy stems from a failure of fiscal resources, then the power given the Commissioner and the State Board to effect changes in local budgets does include the power to increase such budgets beyond the amounts locally determined. Such power must of course be wisely exercised and any such exercise will always be subject to judicial review, but there is no doubt that under the terms of the Act of 1975 such power exists.

This grant of power is responsive to *Robinson* I, where we pointed out that if the State chose, either in whole or in part, to assign its constitutional obligation to local gov-

ernment, it must then afford some mechanism by which local school districts could be *compelled* to raise the necessary funds. 62 *N. J.* at 513, 519. The present enactment, as we interpret it, makes adequate provision to meet this requirement. *State v. Zito,* 54 *N. J.* 206, 218 (1969).

### III

This brings us to a consideration of the portion of the Act dealing with state school aid, *N. J. S. A.* 18A:7A–17 *et seq.* As we sought to emphasize at the beginning of this opinion, unlike the previous occasions during the course of this litigation when this issue has been presented, it is now before us in the context of a full and complete plan designed to provide a thorough and efficient education. Accordingly the state school aid provisions embodied in this Act must be considered, not in comparative isolation, but as a part of the whole proposal formulated by the Legislature. The components of this proposal that are most significant for this purpose are these:

1. What is meant by a thorough and efficient education has now been defined; the goal of such an education has been stated; the elements of which it is to consist have been enumerated.

2. The Legislature has chosen to continue to share fiscal as well as administrative responsibilities with local school districts.

3. Provision has been made for an elaborate system of continuous monitoring and evaluation.

4. The results of this process of evaluation are to be studied and reviewed by the Commissioner, treating the school districts as separate entities, in order to detect any inadequacies or failures.

5. The Commissioner, in coordination with the State Board of Education, is empowered to take all necessary steps to correct such defects, including, where necessary, the increase in amount of local budgets.

The fiscal provisions of the Act are to be judged as adequate or inadequate depending upon whether they do or do not afford sufficient financial support for the system of public education that will emerge from the implementation of the plant set forth in the statute. We are no longer considering the needs of the public system as it existed before the 1975 Act. We assume the Legislature had this in mind when preparing the state aid clauses of this statute.

This fiscal aid generally falls into three categories. The State is to bear the cost of categorical programs which consist of financial support for pupils who fall into special groups such as visually and auditorially handicapped, neurologically impaired, or emotionally disturbed. Aid is based on a per pupil weighted basis. Transportation costs for students who live beyond specified distances from school are to be paid in full by the State. Lastly, the State must pay each school district certain equalization support for its current expenses. The amount of support paid varies depending in part on the relationship of the assessed valuation of the local school district to the State average assessed valuations of all school districts, the general effect being to bring up districts with less than the average nearer to that level.

Each of these financial supports reflect legislative recognition that the "discordant correlations between the educational needs of the school districts and their respective tax bases", 62 *N. J.* at 520, could not be met by exclusive reliance upon local taxation. We cannot say that under these circumstances the dollar input per pupil, keeping in mind that there may be and probably are legitimate differences between and among districts and students, will not be sufficient to offer each pupil an equal educational opportunity as required by the Constitution.

We do foresee a pattern of perhaps quite considerable change coming about as the procedures of this new legislation are brought to bear upon the system as a whole. How much state aid will be needed in any particular district at any particular time to supplement the local levy is some-

thing we cannot forecast. We must assume, as we do, that the state aid provisions in the Act before us represent the Legislature's best effort to prophesy as to what this need will be. Comparison between the provisions of this Act and the State School Incentive Equalization Aid Law, *N. J. S. A.* 18A:58-1 *et seq.,* which *Robinson* I struck down, while perhaps useful, certainly cannot be given significant weight.[4] The power which this new Act gives the Commissioner and the State Board of Education to increase local budgets, would, in and of itself, suggest the dubious value of any such comparison.

This power on the part of state administrative bodies to increase local school budgets requires that thought be given to another factor. As we stated above, *Robinson* I warned that if the State's obligation were delegated to local bodies, provision must be made to compel, if necessary, such local units to raise such funds as might be deemed essential. We have found that the present statute does make such provision. But *Robinson* I went on to say that "if the local government cannot carry the burden, the State must itself meet its continuing obligation." 62 *N. J.* at 513.

Fiscal inability on the part of a local district may conceivably stem from one or more of several causes. One reason would be the lack of an adequate tax base for educational purposes as indicated by the gross disparities shown in per pupil tax resources in the various school districts. The 1975 Act has taken a positive step to more nearly equalize per pupil tax resources by establishing a guaranteed

---

[4]The 1975 Act equalizes from a property valuation per student standpoint a substantially greater number of districts (341 in 1975 and 368 in 1976) because of State guarantees of minimum equalized valuations per pupil, than does the State School Incentive Equalization Aid Law (157). We also note that minimum support aid under this 1975 Act will amount to $48 million in its second year of operation as compared to the minimum support aid of approximately $290 million under the predecessor statute, the distribution of which was enjoined under our prior order, 69 *N. J.* at 155.

valuation per pupil for the school year 1976–1977 of 1.3 times the state average of equalized assessed valuations per pupil. Thereafter the figure is 1.35. *N. J. S. A.* 18A:7A–3. Only actual experience with this formula will demonstrate whether it adequately serves the purpose intended.

Upon occasion fiscal inability may be due to "municipal overburden." This phrase has come to be used to describe non-educational municipal expenses which must be largely financed from the same source — property taxes — as affords fiscal support for education.[5]

■ The 1975 Act is silent as to how this contingency of local fiscal inability is to be met. It does not say, in so many words, where the money is to come from in the event of a showing that a local school district is performing inadequately due to a fiscal insufficiency, together with a further showing of inability at the local level to make up this monetary lack. This omission is not fatal to the facial constitutionality of the Act since State school aid may obviate that predicament. Though such eventuality may never occur, the State must be prepared to meet this contingency if it does arise. We think it would be wise were the Legislature to address itself to this potential problem. It would be helpful and expedient were there to be guidelines — legislative or administrative — as to what kind of showing must be made by a school district asking for state assistance due to local inability to recruit needed funds.

■ *N. J. S. A.* 18A:7A–25 places a limit upon annual budget increases. We are not sure what purpose is sought

---

[5]"Some areas, particularly urban areas, have exceptionally high non-educational expenses which must be financed through property taxes. Expenses which are exceptionally high in urban areas include county and municipal welfare, police and fire protection, and sanitation. In these areas, revenues raised by property taxes which might otherwise be used for education, must be diverted to non-educational purposes." *Robinson IV*, 69 *N. J.* at 169–70 (Pashman, J., concurring in part only and dissenting). See also the ensuing discussion of municipal overburden in the same opinion, 69 *N. J.* at 170–73.

to be served by this provision. It may be the Legislature feared that immoderate increases might unduly add to already excessively high tax burdens. It may have had other aims in mind. In any event the Commissioner is authorized to approve requests for larger increases where the level of spending would be insufficient to meet the goals, objectives and standards established to satisfy the requirements of a thorough and efficient education. How many districts and what amount of dollars are involved is of course unknown at this time; but certainly this escape valve is at least adequate to satisfy facial constitutional requirements.

The 1975 Act makes no mention of the weighting of pupils. This does not mean, however, that the concept is no longer viable under the new statutory scheme. Certainly the Commissioner, in determining "pupil status and needs" and ensuring "pupil progress" would, in all likelihood, take this concept into account.

In *Robinson* IV we ordered the reallocation of educational funds which were to be appropriated for minimum aid on a per pupil basis to the end that the average valuation per pupil throughout the state would more nearly be equalized. However, we did not hold that minimum aid was *per se* unconstitutional. We found it improper in the light of the gross disparities in per pupil expenditures and tax resources existing in the school funding program there under review.

The 1975 Act continues to make some provision for minimum aid upon a per pupil basis; but, when viewed in the context of the over all act which, as heretofore noted, has taken positive steps to eliminate gross disparities in per pupil expenditures and tax resources, such provision cannot be said to be unconstitutional. Only actual experience with the Act will demonstrate whether there is need for further adjustment or modification.

It is our conclusion that the Public School Education Act of 1975 is in all respects constitutional on its face, again assuming it is fully funded. The order of this Court contained in our opinion of May 23, 1975, (*Robinson* IV)

69 *N. J.* at 165, enjoining certain state officials from disbursing appropriated funds except in the manner there set forth is hereby vacated. The Act of 1975 is in full force and effect.

## IV

The Court retains jurisdiction of the cause for the purpose of effectuating the following directions. If the Legislature does not by April 6, 1976 enact a provision for the funding in full of the State aid provisions of the 1975 act for the school year 1976–1977 the Court will, on notice to the parties and to all the school districts of the State, who shall be given an opportunity to be heard, issue an order to show cause returnable before the Court on April 15, 1976 why the Court should not forthwith order one or more of the following, to become effective unless the Legislature thereafter but on or before June 30, 1976, enacts a provision for such full funding:

A. direct a redistribution of such monies for State aid to schools as are appropriated by the Legislature for the school year 1976–1977 in such manner, generally, as to give priority to the satisfaction in full, so far as said funds may permit, of the provisions of the 1975 act for payment of current expense equalization support (exclusive of the 10% minimum support) and for debt service and budgeted capital outlay equalization support, pursuant to Sections 18 and 19 of the act respectively, *pro rata*; and should any excess of such State aid monies thereafter remain, then to the satisfaction *pro rata* of the other State aid provisions of the 1975 act;

B. order such injunctive relief as may be appropriate and necessary; and

C. order such different or other relief as may be appropriate and necessary.

HUGHES, C. J. (concurring). I concur in the result reached by the majority of the Court. And I agree with

its conclusions with regard to the facial constitutionality of the Public School Act of 1975, except to the extent hereafter mentioned. As to those exceptions my concurrence in the majority result is made with some doubt and misgivings, engendered by elements involved in the comprehensive opinion of Judge Conford herein, as well as the able discussion by Justice Pashman of the implications of "municipal overburden." I think it in the interest of justice and clarity that I state my reasons, and why I feel it necessary, despite such doubt, to concur in the result.

When it enacted the 1975 Act the Legislature accepted, in Article I, § 2b(5), the responsibility "[t]o monitor the system of free public schools and provide for corrective action when necessary to ensure adequate progress toward the achievement of goals and objectives." These "goals and objectives" were necessarily framed in the context of the Legislature's recognition (in Article I, § 2a(1)) of its constitutional responsibility to provide for "the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the state * * *." *N. J. Const.* (1947), Art. VIII, § IV, ¶ 1; see *N. J. Const.* (1844), Art. IV, § VII, ¶ 6, as amended, effective Sept. 28, 1875. It is equally obvious at least so long as that constitutional mandate by the people continues in existence, that the Court too must accept its continuing constitutional responsibility (aside and apart from its present decision concerning the facial sufficiency of the Act) for overview (in this or later litigation) of compliance with the constitutional imperative in application of the Act. This obligaton would implicate at the outset scrutiny of the adequacy of standards and regulations to be adopted to implement the 1975 Act, the formulation of which is delegated to the administrators of the legislative purpose (the Commissioner and State Board of Education) and the local Board of Education pursuant to rules established by the State Board. Article II, § 6, 7.

Beyond this, assuming the conditional facial constitutionality of the 1975 Act — the condition being the full and timely funding of the Act as specified by the majority — and the final promulgation of standards and regulations effective to fulfill the legislative purpose and meet the constitutional norm, there yet remains an additional problem going to the heart of the constitutional infirmity identified by all courts which previously have considered this question. That is, even should the Act be facially constitutional, implemented by adequate administrative standards and regulations and fully funded by timely appropriations, is not its "workability," *i. e.,* its actual effectiveness in the field in delivering a constitutional system of thorough and efficient public education, — still an open and, eventually and necessarily, a justiciable question? Put in another way, is the force of the remedial power given the Commissioner and the State Board by *N. J. S. A.* 18A:7A–14 *et seq.,* including the "safety-valve" provision of § 25 of the Act, in coping one by one with the 578 school districts of the State (or that lesser number perceived from time to time to be deficient in meeting the constitutional imperative) conceivably realistic in relation to its purpose? Can these provisions be effective in permitting or compelling the increase of local school budgets or the taking of other steps toward improvement in order to bring about constitutionally appropriate local compliance? And this, against the sentiment of home rule concepts which control all other municipal expenditures from the same taxable base which largely supports public education?

These questions are difficult and their answers almost impossible to prophesy without experience. They relate to the reservations I have had in resolving my proper course of action with regard to the several elements thought by Judge Conford to foredoom, in any case, the constitutional potential of the 1975 Act however its application in actual practice might eventuate. These personal doubts have been particularly puzzling because the long record of this whole

case demonstrates that the local school district insufficiencies (and the consequent frustration of the constitutional promise as to so many tens of thousands of New Jersey school children) result not so much, — perhaps not at all, — from a local reluctance to furnish a thorough education to children in the constitutional sense, but from pressures resulting from deficient financial resources; deficiencies so obviously attributable to imbedded and invidious disparities in the tax bases of so many of our communities. These discordancies are cogently described in the opinion herein of Judge Conford. Such discordancies are rarely disassociated in effect from those equally grave pressures on local government management enveloped in the broad term "municipal overburden," viewed with such concern in the opinion herein of Justice Pashman. These equally vital interests of the people (though not dealt with in specific terms, as is education, in the New Jersey Constitution) whether with regard to police, fire, health or other municipal protection, are plainly related to the life, liberty and pursuit of happiness of the people.

"Municipal overburden" is a cause, but not the only cause of the discordancies of tax resources available for the support of public education. But "municipal overburden" as such, unless we as a Court are willing to embrace the "convulsive implications if home rule is vulnerable" (*Robinson* 1973, — *Robinson v. Cahill*, 62 *N. J.* at 501) must be set aside and considered to be a legislative problem. Even so, its causal relationship to municipal or school district incapacity to support education is not irrelevant. Although the court may not cure, it may certainly recognize "municipal overburden" as a causative factor in the ascertained incapacity of many school districts to meet the constitutional obligation. This even though we recognize that such incapacity may and does occur, apart and aside from the weight of "municipal overburden," from other causes such as a paucity in basic tax ratables in business and residential property.

In considering, as a member of this Court, my constitutional duty at this juncture, I have recalled that the Court does not purport to " 'sit as a super-legislature,' " a role firmly disavowed by this and other courts. *King v. South Jersey National Bank,* 66 *N. J.* 161, 179 (1974) (quoting *Griswold v. Connecticut,* 381 *U. S.* 479, 482, 85 *S. Ct.* 1678, 1680, 14 *L. Ed.* 2d 510, 513 (1965)). Our Court has previously and repeatedly, shown, in its judicial restraint, its profound respect for the doctrine of separation of powers of government. *Robinson v. Cahill* 1973, *supra; A. & B. Auto Stores of Jones St., Inc. v. Newark,* 59 *N. J.* 5, 19 (1971); *Burton v. Sills,* 53 *N. J.* 86, 95 (1968); *Thomas v. Kingsley,* 43 *N. J.* 524, 530 (1965); *Jackman v. Bodine,* 43 *N. J.* 453, 473 (1964); *Grand Union Co. v. Sills,* 43 *N. J.* 390, 403 (1964); *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199, 229 (1960). A court must always adhere to that concept, bending only so far as clearly required to fulfill the constitutional duty its members swore to perform: "I will support the Constitution[s] * * *."

All of us have considered, some with differing views, the potential constitutional defects pointed out by Judge Conford. For instance, a fragment of the "minimum aid" condemned by a majority of the Court in our May 1975 decision (*Robinson* 1975, *Robinson v. Cahill,* 69 *N. J.* 133, 149–50) continues in § 18(c) of the present Act. Its compensation of "rich" districts which so obviously do not need such aid, at the expense of the "poor" districts, is clearly regressive and antithetical to the constitutional goal.

Yet it is much less than heretofore under the "Bateman" formula described by Judge Conford. It appears in the context of a wholly new and unprecedented legislative definition of the constitutional goal (a "plan" as invoked in *Robinson* 1973, 62 *N. J.* at 519). It is not nearly so important now as it was when in our May 1975 decision, 69 *N. J.* at 155, it was diverted to the "equalization" concept of Bateman. As wrong and regressive as it is, I think its magnitude is not such as to require excision, nor to cause the condemna-

tion on constitutional grounds of an act conceived by the Legislature — for the first time in New Jersey history — to define and implement the 1875 constitutional commitment to educational opportunity. I think its logical imperfection, at least presently, may be absorbed in the larger constitutional thrust of the 1975 Act, so urgently needful in the interest of New Jersey children.

Equally describable as regressive in the constitutional sense are the "categorical aids" prescribed in the 1975 Act. Yet these aids, such as transportation costs, so intertwined with the personal safety and well-being of the school population, are so essential that at least at present, and unless future non-action of the Legislature in moving toward equalization of tax resources (insofar as they are essential to constitutional support of a thorough and efficient system of education) should force that issue upon us (a contingency one hopes will not occur), we think these "categorical" aids should not be disrupted regardless of their theoretical and real collision with the constitutional precept.

Similarly, it seems impossible to quarrel with the logical criticism of the constitutional import of § 25 discussed in Section V of Judge Conford's opinion. It may well be, in the actual working experience of the Act, that its arbitrary restrictions on budget increases, as applied to deficient districts trying to "catch up" in their delivery of education as required by the Constitution, may one day result in a determination of unconstitutional application of the Act. Yet one must consider what is termed by the majority the "escape valve" of the Commissioner's power to lift such restriction. The Commissioner, just as the Court, the State Board and the Legislature, is bound to fulfill the constitutional precept and it must be assumed that he will do so.

But it is the final and major point of Judge Conford's caveat that has caused me most doubt, that is to say the inadequate approach of the 1975 Act toward the equalization of tax resources, which lack was identified by *Robinson* 1973 as

the essential cause of failure in fulfillment of the constitutional commitment. The Court there said:

[I]t cannot be said the 1875 amendments were intended to insure statewide equality among taxpayers. But we do not doubt that an equal educational opportunity for children was precisely in mind. The mandate that there be maintained and supported "a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years" can have no other import. Whether the State acts directly or imposes the role upon local government, the end product must be what the Constitution commands. A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command. Whatever the reason for the violation, the obligation is the State's to rectify it. If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing obligation. [62 *N. J.* at 513]

And if the State is indeed to "meet its continuing obligation" to public education by the use of State aid to fill the vacuum of real and proven local incapacity to meet the constitutional commitment, it does not demonstrably do so by the 1975 Act. For it leaves unequalized by State aid dollars what has always been assumed to be an otherwise irreversible tax resource deficiency on the part of many impoverished school districts across the State. Yet the 1975 Act (assuming it is fully funded), as pointed out by the majority, does much else that is good for educational opportunity and is no less than historic in its definition of and commitment to the constitutional goal. *Quaere*: Should it be struck down *now,* because of the lack of a plan of more substantial equalization?

In the area of judicial restraint and moderation there is room for accommodation to the exigencies of government, as pointed out by Judge Conford, in the consideration of practical possibilities of accomplishment. *Brown v. Board of Educ. of Topeka,* 349 *U. S.* 294, 300–01, 75 *S. Ct.* 753, 756, 99 *L. Ed.* 1083, 1106 (1955). This Court has exercised this restraint in the timing of required accomplishment of

a constitutional goal, without abandoning its eventual enforcement. *Jackman v. Bodine, supra; Robinson* 1973, *supra; Robinson* 1975, *supra.* Here one must acknowledge a difference between the timely funding of the 1975 Act as directed by the majority and the implementation over some feasible number of years of the equalization concept of State aid in terms of twice the State average of equalized assessed valuations as described by Judge Conford in his opinion (or some comparable alternative). As to the former, time has run out long since. If the Court were to fail to insist now upon immediate funding of the 1975 Act as a condition to sustaining its facial constitutionality, it would itself be contributing to a profound violation of the New Jersey Constitution. As to the latter, however, considering the beginning of operation and the developmental experience to be expected under the fully funded 1975 Act, I would not now predicate a finding of its unconstitutionality upon its deficient recognition of the need for substantial equalization equivalent or comparable to that recommended by Judge Conford. And if perchance in the reasonably near future there should be no effective step toward equalization, and it were to be established by proofs that such failure caused to continue to fester the invidious discordancies of tax resources destructive of the possibility of meeting the constitutional goal, I would feel constrained to then determine the unconstitutionality in application of the 1975 Act, even as *Robinson* 1973, *supra,* determined as to Bateman, 62 *N. J.* at 515.

SCHREIBER, J. (concurring). I join in the majority opinion, but I believe that the order to show cause mentioned in Part IV of the opinion should include, in addition to the remedies contemplated by paragraphs A, B and C thereof, that suggested by Justice Pashman under which collection of local taxes for the support of the public schools would be enjoined and in lieu thereof a state school tax would be determined and applied to the ratables throughout the State.

The funds collected would then be disbursed through the State Treasurer, subject to the approval of the Commissioner of Education, to the respective school districts.

CONFORD, P. J. A. D., Temporarily Assigned (concurring and dissenting). With all deference to the differing views of the court majority, the writer entertains the firm conviction that in certain important respects, particularly the inadequacy of equalization of tax resources per pupil among the school districts, the 1975 education act, *L.* 1975, *c.* 212, *N. J. S. A.* 18A:7A-1 *et seq.*, does not meet the requirements of the Education Clause of the Constitution as laid down in *Robinson v. Cahill*, 62 *N. J.* 473 (1973) (hereinafter designated as "the 1973 *Robinson* opinion or decision") and as reaffirmed by a majority of the court as presently constituted, less than a year ago, in *Robinson v. Cahill*, 69 *N. J.* 133 (1975) (hereinafter designated as "the 1975 *Robinson* opinion or decision"). Aside from those aspects of the new statute, to which attention will presently be addressed, the writer shares with the majority the view that the act is otherwise facially valid and should so be declared at the present time without the necessity for remand for further factual hearings as demanded by plaintiffs and certain of the *amici.* However, one is compelled to say, with profound regret, that in giving blanket facial approval to the 1975 act *in toto,* the court is departing from the course of fiscal justice to the school children of this State on which it embarked in so enlightened a fashion in the 1973 *Robinson* decision and reinforced so resolutely in the recent 1975 *Robinson* case.

Introductorily, it is to be noted that in the 1975 *Robinson* opinion a majority of this court had no hesitancy in interpreting the 1973 decision of the court as identifying as "the principal cause of the constitutional deficiency" of the previous system of financing public education in this State "the substantial reliance * * * upon local taxation, entailing as it does 'discordant correlations between the educational

needs of the school districts and their respective tax bases' ",
citing 62 *N. J.* at 520; 69 *N. J.* at 141. In essential charac-
ter, the 1975 act now under review retains the vitiating de-
pendency upon local taxation for the bulk of the cost of
financing local education, with its continuing substantial
discordance among the school districts in relation to the
ratio of the tax resources of the districts to the number of
pupils enrolled in the schools. While the equalization sup-
port provisions of the 1975 act, designed to ameliorate the
discordancies mentioned, are an improvement over those of
the previous law (hereinafter referred to as the Bateman
or Bateman-Tanzman Act) (*L.* 1970, *c.* 234; *N. J. S. A.*
18A:58-1 *et seq.*), nevertheless, as will be shown, a sub-
stantial proportion of the State's school districts, of the
pupils enrolled therein and of the equalized assessed valua-
tions represented thereby, remain unaffected by the support
equalizing provisions of the 1975 act. In consequence, it
must follow that the resulting absence of "equality of edu-
cational opportunity",[1] which Chief Justice Weintraub found
fatal to the constitutionality of Bateman in the 1973 *Robin-
son* decision, still condemns the validity of the 1975 act, at
least in part.

The second major aspect in which the 1975 act falls short
of constitutional requirements, to be more fully developed
later herein, is in respect of the provision of substantial
"minimum aid" to all those districts which, because of their
relatively high valuations-per-pupil base, do not qualify for
equalization support aid. The specific holding of our 1975
*Robinson* decision was that "minimum aid" to districts in
that category, as then provided for in Bateman, was invalid
in the factual context of absence of full equalization sup-
port of all districts. Indeed, our order in that case was for
the redistribution of all such minimum aid in accordance
with the equalization support provisions of the Bateman

---

[1] 62 *N. J.* at 513, 516, 520.

Act. 69 *N. J.* at 155. Thus, the 1975 act being flawed because of its failure to provide equalization of tax resources per pupil among substantially all districts, the minimum aid provisions of the act must necessarily also fall.[2]

The 1975 act is, however, readily susceptible of constitutional correction within the general framework of the statute as drawn, as will presently be demonstrated. But an understanding of how the equalization provisions of the act fall short of the constitutional prescriptions of both the prior *Robinson* decisions of this court requires an outline and comparison of the general state aid schemes of Bateman and the 1975 act.

I

A synopsis of the state aid support plan of the Bateman Act is set forth in the 1973 *Robinson* opinion. 62 *N. J.* at 516–518. The basic structure of the plan consisted of three main features. It will be seen that the 1975 act, although differing markedly as to detail, continues in its general aid plan the three main features of the Bateman structure.

These features, as found in both the acts in question, consist of:

(a) an assessed valuation equalization plan designed, in effect to "guarantee" every school district the equivalent of a fixed amount of assessed valuations. The purpose is to give every district whose actual equalized[3] assessed valuations

---

[2] Invalidity also attaches to certain "save-harmless" aid provisions of the 1975 act to which further reference will he had later herein. These were also condemned by the 1975 *Robinson* decision. 69 *N. J.* at 155.

[3] The term "equalized" as used herein in the phrase "equalized assessed valuations" is to be distinguished from the general concept of equalizing districts in their power to support educational expense. The former refers to the statistic resulting from the annual process of determining the true value of all assessed ratables throughout the districts. This is done annually by the Director of the State Division of Taxation, and the resulting "equalized valua-

are below the guarantee level the capacity to raise the same amount of funds for school expenses per pupil through the same school tax rate as every other such district;

(b) a "minimum" per pupil allowance to the districts separate and apart from equalization guarantees;

(c) "categorical" aids to defray the special expenses attendant upon the requirements of pupils especially difficult to educate in various respects. This category also includes the expense of transporting children to and from school and certain other miscellaneous types of aid.

It becomes especially pertinent to compare the equalization aspects of the state aid plans of Bateman and the 1975 act. Bateman was designed to build upon a previous "foundation plan" of $400 per pupil. Districts were to be rated for aid in a five-step scale ranging from "basic" to "comprehensive", the former to be afforded guaranteed valuations at the rate of $30,000 per pupil and the latter $45,000. However no districts other than basic were ever created. A transitional scale of funding of the amount of equalization aid required by Bateman was set up for attainment over a period of years. The original funding was for 20% of the difference between the Bateman formula at the basic level and the previous foundation program. *L.* 1970, *c.* 234. For the school year 1972–1973 the funding was for 40% of the difference. *L.* 1971, *c.* 335. For the school year 1973–1974 the percentage was increased to 66–2/3%. *L.* 1972, *c.* 195. For the school year 1974–1975 the Bateman Act was fully funded (at basic level). *L.* 1973, *c.* 310. However, for the school year 1975-1976, aid was appropriated only at the 1974-1975 level, and full Bateman funding accordingly sustained a shortage of about 18%.

Inherent in the Bateman aid plan is the proposition that districts having actual equalized valuations above the guar-

tions" have been used for distribution of state aid to education under all state aid plans in effect since 1956. See *Tp. of Willingboro v. Burlington Cty. Bd. Tax.*, 62 *N. J.* 203, 209 (1973).

antee level fixed by the act as of any given time will enjoy lower education tax rates for the same amount of education expense per pupil than districts whose actual valuations are below the guarantee level. See the trial court opinion in this case, *Robinson v. Cahill*, 118 *N. J. Super*. 223, 262 (Law Div. 1972). As there stated, "the Bateman Act continues to employ a wealth-based formula." *Ibid*. As of 1971 the guarantee level for state aid was $33,000 per pupil, *ibid*., but there were at that time 208 districts with actual equalized valuations below $35,000 per pupil (4 were below $10,000) and 370 above $35,000 (42 above $90,000). 118 *N. J. Super*. at 242. There was thus obviously inequality of educational opportunity as between pupils in the districts below (so-called "poor" districts) as compared with those above the guarantee level fixed by the Bateman Act (so-called "rich" districts). The studies made by the trial judge from the evidence before him satisfied him that:

"In most cases, rich districts spend more money per pupil than poor districts; rich districts spend more money on teachers' salaries per pupil; rich districts have more teachers and professional staff per pupil, and rich districts manage this with tax rates that are lower than poor districts, despite 'equalizing' aid." 118 *N. J. Super*. at 237–238; and see Appendix A attached to opinion of trial court, *id*. at 282–285.

On review of the trial court adjudication of unconstitutionality of the Bateman financing plan, this court in its 1973 *Robinson* opinion affirmed, resting its holding on the Education Clause (the trial court had also found denial of equal protection, state and federal). The court found "denial of equality of educational opportunity," stating that the adjudication was placed on the same criterion as that employed by the trial court — "on the basis of discrepancies in dollar input per pupil." 62 *N. J.* at 515. But it is apparent from what is noted above that the trial court found in the startling discrepancies in dollar input[4] the *symptoms*,

---

[4]Ranging by district from below $700 per pupil annually to over $1500. See 118 *N. J. Super*. at 242.

not the *root causes* of the constitutional deficiency. The quotation from the trial court opinion excerpted above indicates that it ear-marked the wide discordancies in tax ratable resources per pupil as the most probable *cause* of the extent of the discrepancies in expenditures so fatal to equality of educational opportunity. That this court was in agreement with that diagnosis is established by at least two significant statements in Chief Justice Weintraub's 1973 *Robinson* opinion. The clearest was:

"Upon the record before us, it may be doubted that the thorough and efficient system of schools required by the 1875 amendment can realistically be met by reliance upon local taxation. The *discordant correlations between the educational needs of the school districts and their respective tax bases* suggest that any such effort would likely fail * * *". 62 *N. J.* at 520 (emphasis added).

The other pertinent excerpt is:

"We have outlined the formula of the 1970 Act [Bateman] to show that it is not demonstrably designed to *guarantee* that local effort plus the State aid will yield to all the pupils in the State that level of educational opportunity which the 1875 Amendment mandates. *We see no basis for a finding that the 1970 Act, even if fully funded, would satisfy the constitutional obligation of the State.*" 62 *N. J.* at 519 (emphasis added).

It should be as clear to anyone now as it was to a majority of this court in rendering the 1975 *Robinson* decision, as already noted above, that these passages, taken in the light of the record as a whole and the cogent opinion of the trial court, established the district discordancies in tax resources per pupil as "the principal cause of the constitutional deficiency" of the financing scheme under Bateman. 69 *N. J.* at 141.

It is, accordingly, appropriate to inspect the state aid plan of the 1975 act, in the light of the information of record, to ascertain whether the fundamental constitutional defect under the Bateman Act, noted above, has been eliminated by the legislation now before us.

## II

Article III of the 1975 act deals with pecuniary state aid to the districts. It should be noted, preliminarily, that the State provides a significant amount of local aid outside the coverage of the act, and unaffected by it, in the form of support of the public schools' pension system, entailing for the year 1976-1977 upwards of $200,000,000. This aid is provided on an actual cost, not an equalization, basis. The discussion of the fiscal provisions of the act hereinafter will not be inclusive of those figures except when specifically noted.

State aid for local school districts is provided in three general categories: "equalization support", "categorical aid" and minimum support. Equalization support is calculated separately for "current expenses", Section 18, and for "debt service and budgeted capital outlay". Section 19.

The equalization support formulae are best understood by preliminary attention to certain definitions. "Guaranteed valuation per pupil" means, for the school year 1976-1977, 1.3 times the State average of equalized assessed valuations per pupil enrolled in the schools. Section 3. Thereafter the figure is 1.35. *Ibid.* "State support limit" means the 65th percentile net current expense budget per pupil for the pre-budget year[5] when all district figures are ranked from low to high. *Ibid.* A district's "State support ratio" is determined by dividing the district equalized valuation per pupil by the guaranteed valuation per pupil and subtracting the quotient from 1.0000. Section 18.

The amount of a district's current expense equalization support is derived by multiplying its State support ratio by the smaller of (1) the net current expense budget and (2) the resident enrollment times the State support limit.

---

[5] All references hereinafter to "net current expense budget" or "current expense budget" shall be taken to refer to the pre-budget year.

Section 18. It can be seen that the general concept is to back each pupil in the schools in respect of district current expenses (but not in excess of the State-wide 65th percentile) with tax resources as represented by equalized valuations of at least 1.35 (after 1976-1977) times the State average of the districts. Those districts that have less valuations are in effect brought up to that level by aid; those that are above get no current expense aid or debt service and budgeted capital outlay aid but receive minimum support aid (see *infra*).

State support for debt service and budgeted capital outlay is in the amount of the district's budgets for those items multiplied by the district's State support ratio. If the product is less than zero the district gets no aid. Section 19.

Minimum support aid is in two categories: (a) "minimum aid" (a non-statutory term) of no less in current expense equalization support than 10% of the State support limit, Section 18(c); and (b) "save-harmless aid" (a non-statutory term) assuring every district of no less in state aid of all categories for 1976-1977 than it received during the school year 1974-1975, Section 55, and no less in 1977-1978 than one-half of the difference between what it received in 1974-1975 and what it would be entitled to under the 1975 act. Section 56.[6]

"Categorical" program aid consists of a schedule of "additional cost factors" in weighting pupils attending special education classes[7] (Section 20). Categorical support is cal-

---

[6]The save-harmless moneys are relatively small, and as the provisions phase out after 1977-1978 may be regarded as *de minimis* for constitutional purposes.

[7]The weightings for the various special classes are as follows (Section 20):

| Special Education Classes | Additional Cost Factors |
| --- | --- |
| Educable | 0.53 |
| Trainable | 0.95 |
| Orthopedically handicapped | 1.27 |

culated by multiplying the number of additional cost units by the State average net current expense budget. Section 20(d).

Generally understood as falling under "categorical support" but separately treated in the act is the defrayal of transportation costs. Section 34 and 35. Transportation aid is for the full cost of transporting handicapped children and for the full cost of transportation of any pupils residing beyond specified distances from school. *Ibid.*

Section 25 of the act regulates the rate at which districts may increase budgets for net current expense from year to year, subject to discretionary exemption by the Commissioner. Districts whose budgets are less than the State average may increase at a faster rate than districts at or above the average, the rate depending upon the degree below the average. Districts at or above the State average are all subject to the same maximum rate of increase.

In comparing the equalization aid provisions of Bateman with the 1975 act in order to determine whether the constitutional infirmity discussed above, adjudicated as to Bateman, is also applicable to the 1975 act, the court is not

| | |
|---|---|
| Neurologically impaired | 1.06 |
| Perceptually impaired | 0.85 |
| Visually handicapped | 1.91 |
| Auditorially handicapped | 1.38 |
| Communication handicapped | 1.06 |
| Emotionally disturbed | 1.27 |
| Socially maladjusted | 0.95 |
| Chronically ill | 0.85 |
| Multiply handicapped | 1.27 |
| *Other Classes and Services* | |
| Approved private school tuition | 1.0 plus the additional cost factor of the handicap |
| Supplementary and speech instruction | 0.09 based on the number of ·pupils actually receiving such instruction in the prior school year |
| Bilingual education | 0.16 |
| State compensatory education | 0.11 |
| Approved local vocational education | 0.53 |

remitted to a facial comparison of the two financing schemes. The court has the benefit of extended statistical studies supplied us at our request, and served upon all parties, by the Department of Education. For purposes of the discussion immediately ensuing it will be assumed that a district "equalized" as to valuations under the 1975 act receives equalization benefits equivalent to those of a district equalized under Bateman.[8] It must be conceded, as the majority point out, that a substantially greater number of districts will, under the 1975 act, for the school year 1976-1977, fall within the umbrella of equalization for current expense and for debt service and budgeted capital outlay, than would be equalized under the comparable equalization provisions of Bateman were that act, fully funded, in operation for the same school year.

In the interests of a fair long-range assessment of the equalization effect of the 1975 act use will be made of the Department's figures computed at the 1.35 guarantee ratio which will apply after the school year 1976-1977 (the ratio is only 1.3 for the year 1976-1977). Were that ratio in effect for 1976–1977, 368 of the 578 school districts, or 63.7%, would be equalized.[9] The pupils in those districts

[8]Although, as will presently be shown, equalization under the 1975 act is qualified by certain factors to be noted.

[9]The term "equalized" is here used in the sense of the intent of the act to give every district under a fixed limit of guaranteed valuations the same school tax rate for the same school expenditure per pupil. That limit would be $89,000 per pupil in 1976-1977 (on a 1.35 ratio of State average equalized valuations) if there were no minimum support provisions in the act. With minimum support (10% of State support limit) the intended equalized tax rate applies only to districts with valuations below $80,100 (10% less than $89,000). It is those districts to which the percentages stated in the text are applicable.

To minimize confusion, however, there will be followed hereafter the Department practice of referring to the 1976-1977 guaranteed equalized valuations as being $86,000 per pupil and to those for subsequent years as $89,000 per pupil.

would be 73.5% of all pupils. The aggregate equalized valuations in those districts would be 56.5% of the total. These figures may be compared with the corresponding figures for districts equalized under Bateman for 1976-1977: 157 districts, or 27.2% of total; pupils in such districts being 38.5% of all pupils; and aggregate equalized valuations in such districts being 21.5% of total aggregate equalized valuations.

However, the conceded salutary improvement of the 1975 act over Bateman in the equalization effect just noted does not erase the remaining blunt, egregious facts that (a) under the 1975 act 210 of the districts possess an educational tax resource advantage over the other 368 districts, on a per-pupil basis; (b) that this superior educational opportunity accrues to 26.5% of the State's pupils as against the other 73.5%; and (c) that the gross fiscal measure of that advantage is. represented by the ratio of the 43.5% of aggregate equalized valuations in the favored districts as against the 56.5% of valuations in the districts discriminated against.

The extent of the educational inequality involved in the foregoing situation is exemplified by the fact that, while the 1975 act provides equalization to an equalized valuation level of $80,100 per pupil (see note 9, *supra*), the actual equalized valuations per pupil of the favored districts in many cases run into the hundreds of thousands of dollars per pupil.[10]

Surely, in the light of these patent facts, revealed by the record before us, it cannot be said that under the operation of the 1975 act there will no longer exist the "discordant

---

[10]The constitutional remedy suggested hereinafter will not as a practical matter eliminate all discordancies in valuations per pupil. For example, Teterboro, with one enrolled pupil, has $80,129,986 of equalized valuations per pupil. But on a quantitative basis a practicable and substantially remedial formula will be seen to be feasible.

correlations between the educational needs of the school districts and their respective tax bases" found in the 1973 *Robinson* decision, as noted above, to have presumptively invalidated the Bateman school financing plan because negating equality of educational opportunity.[11]

The presumptive tax rate advantage accruing under the local property tax system and Bateman to districts having high equalized valuations per pupil, found as a fact by the trial court, as noted above, is shown by Education Department exhibits submitted to us to be equally applicable to the 1975 act in projection for the school year 1976-1977.

Illustrative is Exhibit 6 of the Department's evidential exhibits in the case, undertaking to compare prospective local current (educational) expense tax rates, as between different hypothetical school aid plans, in application for the school year 1976-1977. That exhibit, slightly edited for added clarity, is appended to this opinion. It sets forth the statistics for 50 randomly selected districts at evenly spaced percentiles of the rankings of all the districts in respect of equalized values per pupil ("E. V. per pupil"), ranging from Camden, at the lower end with an E. V. of $20,401, to Stone Harbor, with an E. V. of $1,073,027.

For present purposes, the attention of the reader is directed to columns (2) and (3) of Exhibit 6 which compare the prospective current expense effective tax rates under the

---

[11]There was a qualification hereinabove of the concession that a proper comparison of equalizing effect as between Bateman and the 1975 act could be made simply on the basis of the number of equalized districts in the respective plans. See note 8. What was meant was this. Under the 1975 act the equalization factor is limited to the 65th statewide percentile of current expense budgets per pupil; and it is applied to the prebudget, not the current year, so that there is a constant one-year lag behind actuality in the budget figure against which the State support ratio is applied. These inhibiting factors were not present in computing incentive formula equalization aid under Bateman and should be regarded as narrowing the *prima facie* improvement in equalization of the 1975 act over Bateman.

1975 act and under the Bateman Act (there designated as "Bateman-Tanzman"). It will be seen that in relation to both the 1975 act and Bateman tax rates remain relatively stable for all the districts whose equalized valuations fall under the guarantee level (under the 1975 act) of $86,000 per pupil. As the districts, beginning with No. 71 (Nutley), approach and rise above that level, tax rates begin to go down, and drop precipitately with the 20-25% of districts at the upper end of the equalized valuations scale.

Of particular relevance to the differences between the writer and the majority concerning the constitutional viability of the 1975 act in relation to the extent of equalization of the districts, it is pointed out that the exhibit shows that there is rough comparability between the 1975 act and Bateman as to the point where differences in equalized valuations of the districts begin to manifest themselves in significant reductions in effective school tax rates. This of course strongly negates the implication of the majority opinion that the 1975 act improves district equalization, as compared with Bateman, to an extent justifying the court in regarding the condemnation in our prior decisions of Bateman in this respect as now overcome.

The same lesson is to be drawn from the rationale of our 1975 *Robinson* decision, directing the order of redistribution, written by the Chief Justice and subscribed to by five members of this court, 69 *N. J.* at 149–151, 155, and a comparison of the effect of that redistribution with the operation of the 1975 act. The sum and substance of the 1975 court order was to effectuate an interim step toward constitutional compliance in a state aid system which had been adjudicated constitutionally defective. What we did was to take certain state aid moneys not related to equalization of district tax resources per pupil and order them redistributed in accordance with the equalization formula of the Bateman Act. In doing so we said that that course would tend "to subserve the goal of equality of educational opportunity." 69 *N. J.* at 149. We accepted as sound in

principle the contention there addressed to us by the Governor that the six categories of state aid (non-equalizing) which he sought to have redistributed "are not compatible with the *Robinson* criterion of equality of educational resources for the pupils, whereas the incentive formula is." *Ibid.*

We thus could not have more clearly identified the objective of equalization of district tax resources per pupil with the transcendental objective of the Education Clause specified in the 1973 *Robinson* decision — "an equal educational opportunity for children."[12]

We were, however, careful to point out in the 1975 *Robinson* decision that the order there directed was not conceived of as a final and perfect implementation of the Education Clause but as an "essential and *minimal* interim *step* in the enforcement of the Education Clause," 69 *N. J.* at 154; as a "positive *step* *toward* the end result of full constitutional compliance," 69 *N. J.* at 151 (emphasis added).

However, examination of the statistical effect of the 1975 court order and comparison thereof with the operation of the 1975 act shows that the 1975 act does not constitute a significantly greater advance in the direction of full equalization of districts than the court order, even crediting the 1975 act with a 1.35 guaranteed valuation ratio (applicable only after 1976–1977). Under the court order the percentage of equalized districts is 59.6, compared with 63.7% for the 1975 act; the respective percentages for pupils in such districts are 72.2% as against 73.5%; and the percentages of aggregate equalized valuations in such districts are 55% as against 56.5%. The comparison thus reveals essential parity in equalization as between the court order and the 1975 act.

Equalizing aid for current expenses in 1976-1977 under the 1975 act is, at a total of $568,093,418, only minimally

---

[12]"But we do not doubt that an equal educational opportunity for children was precisely in mind" [in the formulation of the Education Clause]. 62 *N. J.* at 513.

above the comparable figure of $551,080,454 under the court order.

The *amici* who support the plaintiffs in this case have submitted tables of statistics demonstrating that the urban districts, characteristically low in ratables per pupil and characteristically high in non-school burden on the tax base as well as in number of children requiring special educational effort, fare substantially better under the court order than under the 1975 act. While, as shall be more fully developed later herein, the equalizing effect of the 1975 act in a constitutional sense cannot be judged exclusively by a comparison of effects on urban *vis a vis* non-urban districts, there is broad unanimity of opinion that the urban districts, for the reasons given, are peculiarly in need of equalizing state aid to education.

In summation of the present discussion, it is difficult if not impossible to reconcile the thesis that the court order of 1975 was only a step in the direction of achievement of full equalization of educational opportunity with the position of the defendants and the majority that the enactment of the 1975 act has achieved the requisite constitutional level in that regard.

## III

The majority have not satisfactorily dealt with the constitutional deficiency of the 1975 act discussed above. After noting the fact that more districts achieve equalization under the 1975 act than under Bateman (note 4, p. 465), the opinion is content to say, peremptorily, that comparison of the state aid effects of the 1975 act and Bateman "certainly cannot be given significant weight." (p. 465). This conclusion is rested on the Commissioner's power under the 1975 act to compel the districts to raise their budgets if inadequate. However, conceding that the Commissioner's statutory power to direct "budgetary changes" in a deficient district includes the power to direct an increase in any such

budget, the exercise of such a power against a district of relatively low equalized valuations per pupil — a district whose pupils are already unconstitutionally discriminated against under the criteria of the 1973 and 1975 *Robinson* decisions — would simply be to exacerbate the existing denial of equality of educational·opportunity to the pupils in such districts. It would place added strain on tax rates already inflated by inadequate bases of ratables per enrolled pupil.

The majority note (at p. 465) that in our 1973 *Robinson* decision it was pointed out that if a district were unable to raise the funds to provide the requisite educational opportunity for its pupils, "the State must itself meet its continuing obligation." 62 *N. J.* at 513. But the majority concede that the 1975 act contains no provision for meeting this contingency and exhort the Legislature to address the problem. The majority do not regard the matter as critical to the facial constitutionality of the act, saying that the contingency of local fiscal inadequacy "may never occur." With all due respect to the majority, the latter observation ignores the fact established in the record before us that inadequacies have abounded in our educational system in many parts of the State, see 118 *N. J. Super.* at 247, 249–252. It also ignores the adjudication in our prior decisions in this case that (a) inequality of educational opportunity is *per se* a denial of the guarantee of the Education Clause; and (b) discordancies in tax resources among the districts on a per pupil basis is presumptively a denial of equality of educational opportunity in the districts disadvantaged by such discordancies. It has been shown above that these pernicious conditions continue under the 1975 act.

One can agree with the majority that the matter of achieving educational adequacy in our public schools has not heretofore been addressed by the Legislature in the comprehensive manner reflected by the 1975 act. It is salutary that this has now been done. But the matter of achievement of substantive excellence in the educational process was not the heart of the grievance which led to the filing of this action

in the first instance. That consisted of the claim that the Education Clause implied either equality of treatment among taxpayers or "equality among the pupils of the State and that such equality is not achieved and cannot be achieved by a system of taxation which depends upon the existing local tax base." 62 *N. J.* at 509–510.

Basically, the latter contention was upheld by this court in the 1973 *Robinson* case. As the majority recognize, we approached the issue before us in the 1973 *Robinson* case as involving "the constitutionality of statutes providing for the *financing* of elementary and secondary schools," 62 *N. J.* 480 (emphasis added), not the constitutionality of different methods of imparting education or of contending theories as to the merits of comparative educational goals or processes, unrelated to the matter of financing.

The issue before the court ever since this litigation began always has been, and remains, the constitutionality of *the system of fiscal treatment* by the State of the districts in respect of education and the presumptive effect thereof upon the educational opportunities of pupils. The mere enactment of the 1975 act did not draw a curtain of irrelevance over the pre-existing system of financing education or obliterate the relationship of that system to that enacted in 1975. Nor did it, or any idealistic educational aspirations expressed therein, nullify the prior holdings of this court that there is a denial of equality of educational opportunity where one district can draw on substantially greater tax resources per pupil to support education than another district.

And so the fundamental issue before us has not, as one might gather from the majority opinion, been transmuted into the more remote future question of whether particular districts will on particular future occasions be shown to be inadequately financed for the administration of their educational function. The issue remains whether the *systemic* constitutional deficiencies of the Bateman plan *as an entirety,* twice adjudicated by this court, have been eliminated in the

1975 act. The very purpose of the court's retention of jurisdiction over the matter to the present time has been to make certain that any adopted statute measured up to the constitutional criteria we set in our prior decisions. In that sense the 1975 act does not start off with the ordinary presumption of constitutionality. The burden lies with its proponents. It has not been met. It is clear that the deficiency inherent in the substantial continuance among the districts of unremedied discordancies in tax resources per pupil is, unless corrected, fatal to the validity of the 1975 act.

To hold this act wholly valid in the face of the facts of record is to return to the disastrous era of legislative *laissez-faire* in school financing which led to the 1973 *Robinson* decision of this court.

## IV

The other patent constitutional defect of the 1975 act is the continuance of the feature of "minimum" support to districts whose equalized valuations are so high as not to qualify for the full amount of current expense equalization aid specified by the act. A comparable but less invidious minimum aid feature of the Bateman Act was expressly held unconstitutional in our 1975 *Robinson* decision and an order entered that any such aid appropriated for the year 1976-1977 should be redistributed in accordance with the incentive equalization formula of the Bateman Act. 69 *N. J.* 133, 149, 155. The minimum aid provisions of Bateman were less invidious than those of the 1975 act because the former went on a uniform per pupil basis to all the districts, including those who qualified for equalization aid, while the latter call for distribution only to those who do not qualify for full equalization aid.

Since the basis for our holding in the 1975 decision was that minimum aid to all districts exacerbated the inequality produced by insufficient equalization of the districts as to ratables, 69 *N. J.* at 149, and it has been demonstrated above

that there is insufficient equalization of districts under the 1975 act, there is no choice but to find the minimum aid provisions of the 1975 act to be invalid. The majority opinion defends the minimum aid provisions of the 1975 act on the thesis that the act takes "positive steps to eliminate gross disparities in per pupil expenditures and tax resources." (p. 467). The contrary evaluation fully explicated above is confidently rested on the record of this case. The majority also point out (at note 4 on page 465) that minimum aid under the act (after 1976–1977) will be $48 million as compared with the $290 million of such aid under the Bateman Act. However, only $163,885,000 of the latter sum would have gone to districts above the Bateman equalization guarantee level, the balance going, as noted above, to districts below that level and thus also receiving equalization support aid.

In any event, the principle of the invalidity of aid to "rich" districts when a substantial number of "poor" districts are underfinanced, declared in the 1975 *Robinson* case, must condemn the minimum aid provision of the 1975 act.

## V

The last aspect of the 1975 act deemed constitutionally vulnerable is Section 25. As noted earlier herein, that section, subject to discretionary exemption by the Commissioner, imposes totally arbitrary restrictions on the rate by which districts may increase budgets for net current expense from year to year. The formula fixed by the act is such that a substantial number of districts would be prevented from increasing their budgets at a greater rate than is compelled by normal average inflation, without substantive improvement of educational performance. If most districts, as is highly probable, increase their budgets annually at the maximum rate permissible, the disparities in expenditure levels between districts spending at the statewide average rate and those spending at substantially higher rates will never be reduced. This result is obviously at war with the object of remedying the major flaw found by our court in the 1973 *Robinson*

decision in the previous financing system — the gross disparities in expenditure levels as between the districts.

Unless the Commissioner is to exercise his power of exemption on a practically wholesale basis, the operation of Section 25 plainly conflicts with the purported object of the act to ameliorate the principal evil this court found inherent in the Bateman plan. Section 25 should be exscinded from the act as unconstitutional.

## VI

It has been indicated earlier herein that the 1975 act is regarded as constitutionally correctible, without disturbing its general plan and scheme. Aside from eliminating minimum support aid and exscinding Section 25, both of which steps are readily feasible, the key to validation of the act lies in increasing the guaranteed valuation per pupil for current expense equalization support (and debt service and budgeted capital outlay) from the statutory ratio (after 1976-1977) of 1.35 times the State average valuation per pupil to a figure more realistically consonant with the constitutional objective of substantial elimination of discordancies in equalized valuations per pupil above the fixed guarantee level. The object would be to meet in principle the requirements in this regard of both the 1973 and 1975 *Robinson* decisions but yet not exact from the State a financial burden totally out of proportion with reasonable standards as to what it can be expected to raise by taxation.

Several considerations conduce to the view that increasing the guaranteed valuation ratio from 1.3 to 2.0 would satisfy the constitutional requirement of equality of educational opportunity to a substantial degree and yet not overbear the practicalities of governmental capacity in this era of fiscal strain.

The ratio of 2.0 times the State average was that advanced by Governor Byrne in 1974 as optimal for this purpose and was contained in an early version of the bill[13] which was ul-

13Senate, No. 1256, 1974, Section 3.

timately enacted as the 1975 act. It is also strongly supported by *amici* N. J. Education Association and N. J. Association of School Boards (although they have not claimed it to be a constitutional requisite).

If twice the State average had been the adopted ratio under the 1975 act, 521 districts of the 578 in the State, encompassing 98.17% of all the enrolled pupils in the State, would have been covered by the umbrella of equalization of tax resources per pupil in 1976–1977. To require the coverage to include *all* districts would be impracticable since the highest districts in terms of equalized valuations per pupil represent extremely atypical situations, and the cost thereof to the State would be grossly excessive.[14]

The 1976–1977 cost of equalizing districts at the level of guaranteed valuations of twice the State average would have resulted in a total contribution of state aid in all categories of $1,552,000,000, as against $1,131,000,000 for the statutory level of 1.3 and $1,156,000,000 for the level of 1.35 (applicable after 1976–1977).[15] It would raise the State share of the cost of education to about 52%.[16]

---

[14]As against the 1976-1977 State average equalized valuations of $66,078 per pupil, there are such abnormal districts as Teterboro (Bergen) with $80,129,986, Rockleigh (Bergen) with $2,445,552 and Stone Harbor (Cape May) with $1,073,027.

[15]The scale of State contribution in 1976-1977 at various assumed levels of ratio between 1.3 and 2 is:

| State Avg. E.V. ($66,078) | Guaranteed Valuation | All Categories |
|---|---|---|
| 1.3 | $ 86,000 | $1,131,000,000 |
| 1.35 | 89,000 | 1,156,000,000 |
| 1.45 | 96,000 | 1,231,000,000 |
| 1.55 | 102,000 | 1,293,000,000 |
| 1.65 | 109,000 | 1,361,000,000 |
| 1.75 | 116,000 | 1,424,000,000 |
| 1.85 | 122,000 | 1,475,000,000 |
| 2.00 | 132,000 | 1,552,000,000 |

[16]For 1976-1977 the 1975 act as drawn results in a State contribution to the total cost of education of 38%. (This includes the

Assuming that the legislative medium of choice to accomplish equalization as between districts would be the general scheme of the 1975 act, which was found valid in all other respects (save minimum support aid and Section 25, discussed above), a ratio of twice the State average would be concluded to be a reasonable accommodation of the practicalities and the constitutional objective and thus a valid and constitutional solution to the problem of achieving equality of educational opportunity from the fiscal viewpoint.[17] It would accomplish substantially full statewide equalization of tax resources per pupil, within the practical limitations presented by the atypically high districts referred to above and the State's potential resources. The Legislature in its wisdom may of course choose a higher ratio than twice the State average, or, indeed, select any other mechanism which in substance effects an adjustment of supporting tax resources per pupil to the equivalent in equalization of what the 1975 act would produce at the twice-the-State-average basis.

It should be pointed out that full equalization is not regarded as a panacea for accomplishment of a thorough and efficient statewide system of education. An effective implementation of Article II of the 1975 act is essential toward that end. But it may take decades for that to come to pass. In the meantime the districts must as a constitutional imperative be relieved of the brunt of the inequalities in local fund-raising capacity which this court has determined adversely affect equality of educational opportunity, and thus,

State payments for teachers' pensions.) At the 1.35 level (applicable in subsequent years) it becomes 40%. Significantly, it was contemplated that Bateman, fully funded, would peg the State's contribution to the total cost of education at 40%. See p. vii, Bateman Report. Yet Chief Justice Weintraub said, in the 1973 *Robinson* case: "We see no basis for a finding that the 1970 act [Bateman], even if fully funded, would satisfy the constitutional obligation of the State." (62 *N. J.* at 519).

[17] It is assumed that the other funding provisions of the act would not be altered so as to dilute such equality.

by our equation in the 1973 *Robinson* opinion, the thoroughness and efficiency of the system as a whole.

An important consideration related to the practicalities of government obtrudes itself, however, at the notion of a State support plan which in 1976-1977 would cost the State about $400,000,000 above what is required fully to fund the 1975 act. However, the demands of constitutional disposition can be accommodated to governmental exigencies, whether sociological, see *Brown v. Board of Ed. of Topeka,* 349 *U. S.* 294, 301, 75 *S. Ct.* 753, 99 *L. Ed.* 1083 (1955) (directing the enforcement of school desegregation "with all deliberate speed"), or economic, as here. The fiscal difficulties of government in these times, and particularly of this State, call for such accommodation here.

Consequently, it is proposed that if the Legislature responded to these views by acceptance of the two-times-average valuation suggested as minimal, the phasing in of the change in ratio from 1.3 to 2.0 could be permitted to take place in the following manner. First, since the minimum aid provision of the act is invalid, the $54,000,000 of minimum support provided for under full funding of the act in 1976-1977 would be required to be redeployed in that year to raise the guarantee level as far as those funds would permit. The difference in the guarantee level between 2.0 and the raised level just mentioned could be made up over a period of not more than five school years following the school year 1976-1977, in equal annual stages to the nearest multiple of 0.05, reaching 2.0 no later than the fifth year. The formula selected would be required to be stated in an amendment of the 1975 act.[18]

---

[18]While it is not a judicial concern as to how the State raises the funds to meet its constitutional obligation to afford equality of educational opportunity, it should be observed that the result of the writer's proposal — a State share of the cost of education to the extent of 52% of the total — is by no means radical. The comprehensive study and report of the prestigious New Jersey Tax Policy Committee, submitted to Governor Cahill February 23, 1972,

## VII

Aside from the matters discussed above, accord is reached with the majority as to the absence of any other material issue of fact relevant to constitutionality which would justify the remand and hearing sought by some of the parties and *amici*, and the 1975 act is found facially constitutional in all such other argued respects. The additional contentions warrant some discussion.

Preliminarily, it is noted that it is fully four years since the Law Division held the Bateman Act violative of the equal protection provisos of the state and federal constitutions and of the Education Clause of the State Constitution. It is almost three years since we affirmed that holding on the basis of the Education Clause in the 1973 *Robinson* decision. A great amount of work, study, consultation and money has

---

unanimously recommended *full State financing of local education.* Summary Volume p. 17. The Committee stated that "[t]he property tax is the chief cause of the major defects in the [tax] structure. The tax is by all measures either the highest or near-highest in the nation. It is harshly regressive." Summary Volume p. vi. In explaining its recommendation for full State funding the Committee said:

> Wide disparities in spending per pupil now exist, due to such factors as differences in regional costs of living, differing education problems, and varying education standards among districts. In response to these diverse influences, actual expenditures per pupil are heavily affected by underlying differences in taxable valuations per pupil. A State funding program must be flexible enough to recognize inherent differences among districts and yet be expressed in terms of a uniform quality of education which eliminates the effects of taxable wealth as a factor in educational quality. Summary Volume p. 17.

The concordance of the views of the Committee with those heretofore expressed by this court as to the effects of differences in district taxable wealth on the quality of the educational opportunity offered by a district will be readily noted.

The present and the previous two governors of this State have made strong representations to the Legislature and the public as to the urgent need of reducing the proportionate share of the burden of local government, including education, to be borne by the local property tax. Effectuation of the constitutional precepts expressed in this opinion would of course tend toward that objective.

been invested by the other branches of government in an effort to achieve compliance with the court's adjudication.

The thorough and efficient education of almost one and a half million school children and their successors in the decades ahead lies in the balance. The public educational establishment of State and local government has been in a state of tension and uncertainty from year to year during the period of this litigation over how much money it could count on for performing its vital function. Planning has periodically been disorganized and frustrated. Whereas the heretofore statutory scheme has called for the State Commissioner of Education to advise the districts by October 1 of the prebudget year as to how much state aid they could count on, that assurance has not been possible the past two years at least, partly because of uncertainty as to how the Legislature would respond to our prior decisions in the litigation, or indeed, to the fiscal requirements of the 1975 act itself. There can hardly be any doubt that as a result the ongoing process of public education in this State has suffered and is presently suffering.

All of the foregoing conduces to the conclusion that this court should now, as a matter of sound public policy, if reasonably possible on the record before us and on facts of which we can take judicial notice, determine the extent to which the 1975 act does or does not meet constitutional requisites, definitively indicate how it can be repaired legislatively to the extent that it does not, and apply firm and legally acceptable remedies to assure, if at all possible, an early end to this litigation and the implementation of an adequate and constitutional system of public education beginning with the school year 1976-1977 (commencing July 1, 1976). It is in that spirit that the court has approached and attempted to resolve the several issues posed by the motions, briefs and oral argument.

The matter of the asserted need for a further record needs to be approached separately in respect of the attack on goals and standards as distinguished from that on fund-

ing. The former aspect is simpler of resolution. The grava- men of the assault on the statutory goals is (a) that the edu- cational system purportedly constructed by the 1975 act is not complete until administrative regulations are adopted and (b) that such preliminary drafts of proposed regula- tions as were extant when the briefs were filed were deficient in not establishing or providing for the establishment of "uniform pupil performance standards" in basic skill areas claimed to be necessary for effective citizenship and com- petition in the labor market, see the 1973 *Robinson* decision, 62 *N. J.* at 515, and of an evaluation system for pupil per- formance in relation thereto.

All that is before us now is the new statute. The statute defines goals, standards and objectives. No statute other than Bateman was under review in the 1975 *Robinson* case and therefore what we said there about "inchoate and horta- tory regulations" as to administrative goals then in prepara- tion is not now relevant. 69 *N. J.* at 145. There is no hesi- tation in pronouncing the educational goals, standards and guidelines in Article II of the 1975 act facially valid and not *themselves* susceptible of attack on any hypothetical set of facts which might be developed on a new record. This much is conceded by *amici*, Education Committee NAACP (Newark) and ACLU of New Jersey, who otherwise gen- erally support the attack upon the act. The goals, standards and guidelines stated in the act are obviously comprehensive, pertinent to the objective of achieving a thorough and ef- ficient system of education and susceptible of administrative implementation toward that end. There is no sound reason why we should not so adjudicate now. See *Regional Rail Reorganization Act Cases*, 419 *U. S.* 102, 144, 95 *S. Ct.* 335, 42 *L. Ed.* 2d 320 (1974). It will of course be open to any- one to attempt to demonstrate in the future that the system, as applied in operation, or the regulations,[19] are constitu-

---

[19]The regulations were adopted by the State Board of Education January 7, 1976.

tionally defective, see *id., 69 N. J.* at 154–155, but that will be a different litigation from this. There is therefore no present occasion to consider the constitutionality of the State Board regulations as to goals, methods and guidelines.

The question as to whether a factual record beyond what is, and since the 1973 *Robinson* decision has been, before us, is necessary or appropriate to demonstrate that the funding and fiscal features of the legislation meet or do not meet the Education Clause can best be explored in the context of a consideration of the merits of the opposing arguments with respect to the constitutional attack on those aspects of the law.

### A.

One main line of constitutional criticism of the fiscal aspects of the statute advanced before us is that there is nothing in the act to satisfy the admonition of the 1973 *Robinson* decision that in order to meet the Education Clause the State must not only "define * * * the educational obligation" but *"compel* the local school districts to raise the moneys necessary" to achieve any such stated standard, 62 *N. J.* at 519 (emphasis in original), unless the State itself acts in the matter. *Id.* at 513. If, *arguendo,* the contention goes, the standards have been adequately defined by the act, there is nothing in the act to assure that the districts can or will be able to raise the moneys needed; if the districts cannot raise the money there is nothing in the act to require the State to raise the funds for the district; *ergo,* the act defaults on the Education Clause, even as did Bateman. The premises stated, are, it is believed, correct. It has expressly been so noted earlier in this opinion. But the conclusion of unconstitutionality *on that ground* does not necessarily follow.

The 1973 *Robinson* decision is misread if it is inferred therefrom that the gist of the unconstitutionality found by the court was, alone, the absence of a mechanism to deploy

sufficient moneys in particular districts to remedy the failure to achieve a legislatively fixed prescription for a thorough and efficient education. As has been developed at length above, what the Constitution demands and the court found lacking in the 1973 *Robinson* decision is a *statewide system* of financing a thorough and efficient education so as to afford equality of educational opportunity to all children, not merely a rescue apparatus to salvage particular isolated districts found deficient where the statewide system is equitably financed. The court's comments as to the need for the State to identify the educational opportunity it would provide must be read in the context of the express adjudications noted hereinabove that the prime benchmark of the failure and unconstitutionality of the *system* was the wide ranging "discrepancies in dollar input per pupil", 62 *N. J.* at 515, see also 118 *N. J. Super.* at 235–246, and that the principal cause of those discrepancies was the discordant correlations between the educational needs of the districts and their respective tax bases. 62 *N. J.* at 520.

Plaintiffs and *amici* argue that the heart of the invalidity of Bateman, and now also of the 1975 act, is the discrepancy in dollar input per district, and they desire an opportunity on a remand to demonstrate this thesis as to the 1975 act as applied. Our dissenting colleague, Justice Pashman, agrees with them.

From what has been said above it will be apparent that that thesis is not agreed with. The facts as to discrepancies in dollar inputs are amply set forth in the exhibits before us. A remand is not needed to establish the facts, which are conceded. It has been shown above that the wide disparities in dollar expenditure are symptoms, but not the causes, of the constitutional deficiency — that the most basic cause of the existing wide disparities in expenditure levels is the discordancies in taxable wealth per pupil. See discussion, *supra*.

In the 1973 *Robinson* decision we observed that some variables in district expenditures were legitimately expectable

because of variations in area costs, special costs of educating particular kinds of pupils and the right of districts to "go further" in advancing the education of their children provided the State's mandated responsibility for all other districts was not diluted. 62 *N. J.* at 520.

What concerned us in the 1973 *Robinson* case was the startling *extent* of the disparities in expenditure, ranging in 1971 from 14 districts with current expense per pupil of below $700 to 16 districts with over $1500. 118 *N. J. Super.* at 242. As noted above, this, to us, constituted *prima facie* evidence of denial of equality of opportunity to the pupils in the districts at the lower end. And the strong correlation, by and large, of low-spending with low-wealth districts corroborated in our minds the inculpation of discordancies in per-pupil tax wealth as a principal cause of the constitutional deficiency.

If equalization of tax resources per pupil were effected to the extent indicated above as minimally obligatory, one could expect that over the long run, with the aid of effective and thoroughgoing State enforcement of the goals, standards and objectives set forth in Article II of the 1975 act, the hitherto extreme variations in district expenditures would be substantially reduced and the lowest spending districts would be achieving a satisfactory performance. If this did not occur, and demonstrable shortcomings in the system still persisted notwithstanding exhaustion of administrative remedies, pointing to absence of thoroughness and efficiency in the educational process, the courts would remain accessible for constitutional relief.

But one can readily agree with plaintiffs that there is no realistic promise of reduction of the existing excessive disparities in pupil expenditure among the districts in the paper remedies of the 1975 act if more substantial equalization of tax resources per pupil — or some equivalent automatic remedy — is not put into effect. The necessity for the latter

is absolutely basic to any scheme purporting to hold the promise of equality of educational opportunity.

Attention is addressed to the other substantive constitutional challenges mounted by plaintiffs and supporting *amici*. The gist of their position is that the principal sufferers from the present unconstitutional system are the school children in the heavily urban districts, and they assert that their plight is not significantly ameliorated by the 1975 act. They note that the substantial "weighting" of children from disadvantaged homes provided for in the Bateman equalization formula, see 62 *N. J.* at 517, is eliminated in the 1975 act. They offer statistical analyses in graph form purporting to demonstrate that the invidious correlation of high district wealth (equalized valuations per pupil) to high educational expenditures, and *vice versa,* was more pronounced under Bateman than under the May 1975 court order. They challenge the use of the prebudget year as the base for estimating State current expense aid and also the limitation to the 65th percentile under the "State support limit". Complaint is also registered as to the failure of the 1975 act to compensate for "municipal overburden", see 69 *N. J.* at 150–151. The retention of expensive categorical aid programs on a per pupil cost basis rather than on an equalization basis is assailed as furthering inequity to the low-wealth districts. Moreover, plaintiffs attack Section 25 of the act on the ground it creates unwarranted barriers against low-spending districts attempting to reduce the very disparities in expenditures *vis a vis* high spending districts which this court, as noted above, saw as the main benchmark of the unconstitutionality of Bateman. The writer has hereinabove expressed his agreement with the contention that Section 25 is invalid. Finally, plaintiffs make the assertion, which has also been found above to be well-founded, that the minimum support provisions of the 1975 act are invalid.

B.

The comparisons tendered by plaintiffs and *amici* between the effect of the May 1975 court order and the 1975 act in relation to distributions to districts are not determinative in constitutional effect. Note was taken above of the fact that such comparisons tended to refute the position of defendants that the 1975 act sufficiently effected equalization of valuations as among the districts. However, the court order was not the court's concept of an absolute constitutional standard or even of a necessarily well-considered state-aid plan. The incidence among the districts of the distribution which would have resulted therefrom was simply the fortuitous outcome of an interim device designed by the court only to eliminate the obviously objectionable minimum support feature and to redeploy those funds in the constitutional direction of equalization of supporting resources per pupil. The more pertinent comparisons for present purposes are between the 1975 act and Bateman, whose invalidity defendants assert has been cured by the new statute.

C.

No compelling constitutional implications are perceived in the tendered comparisons of treatment of urban *vis a vis* non-urban districts under the former and new legislative plans. Equality of educational opportunity is guaranteed under the Education Clause for children in all manner of districts. What is of significance in that regard is how low-expenditure and low-valuations-per-pupil districts *vis a vis* high ones fare under the respective plans. There are low and high districts in both respects in non-urban as well as urban districts.

A more appealing point is made when plaintiffs complain about the failure of the 1975 act to take municipal overburden into account in formulating the equalization plan. Both in the 1973 *Robinson* decision, 62 *N. J.* at 499, 519, and

the 1975 *Robinson* decision, 69 *N. J.* at 150–151, we recognize the interrelationship between school needs and non-school needs as dependent on the same local tax base, and it is obvious that an overload of non-school burdens (welfare, police and fire protection, health and sanitation and the like) in some urban districts as compared to suburban or rural districts may seriously disadvantage the former in defraying the cost of education. But here again, the problem is not monochromatic. We pointed out in the 1975 *Robinson* decision that some municipalities with high valuations per pupil also have high non-school burdens. 69 *N. J.* at 150–151. Plaintiffs and supporting *amici* have advanced no specific, feasible proposals as to how a state school-aid formula could fairly and uniformly reflect municipal overburden as such; nor do they suggest how a remand hearing would be productive in that regard. We gave thought to the matter for interim remedy purposes in the 1975 *Robinson* case but abandoned the effort as unproductive. 69 *N. J.* at 151.

In any event, it is concluded that the problem posed is legislative, not constitutional. Tinkering with the mechanism for the support of local government by local taxation in the name of fostering equality of educational opportunity would raise problems cognate to the question considered in the 1973 *Robinson* case as to whether the system of financing education in this State violates equal protection in the state constitutional sense. After pointing out that a judicial effort in that direction would entail challenging the whole historic scheme in this State of local government as expected to defray all the normal burdens of such government, albeit with unequal tax bases, we rejected the approach, adverting to the "convulsive implications if home rule is vulnerable" on such grounds. 62 *N. J.* at 501.

The home rule system and its attendant inherent variables between local tax bases and local governmental needs of all kinds was well established in this State when the Educational Clause first became a part of our Constitution in 1875.

Those variables had become even more pronounced by the time the Education Clause was readopted intact as part of the Constitution of 1947. It would therefore be sheer judicial constitution-making for the court now to embrace the proposition that a system of thorough and efficient education as envisaged by the framers must adjust the capacity of school districts to finance education in terms of the respective abilities or disabilities of the corresponding municipalities to finance their non-educational burdens. Those problems, pressing as they surely are, exist entirely independently of the Education Clause, and are for the attention of the Legislature, not the courts.

The 1975 act does not fail because not attuned to municipal overburden. One can so conclude as a matter of law, whatever facts plaintiffs might be able to establish on a remand.

### D.

Also germane to the plaintiffs' "urban" approach is their assault on the elimination of the weighted pupils factors as provided for in Bateman[20] and the substitution therefor in the 1975 act of the additional cost factors for pupils in special education classes. Again, the appropriate response is that the matter is one purely of policy for the Legislature, and not one of constitutional dimension.

### E.

Another substantial challenge is raised by plaintiffs with respect to the categorical aid program of the 1975 act, with aid for transportation costs included under that head. Plaintiffs cogently argue that since one of the prime thrusts of the 1973 *Robinson* decision is the insufficiency of equalization of

---

[20] In particular, plaintiffs stress the factor whereby each "AFDC" child (one whose family is on welfare) is weighted by an additional .75 units. *N. J. S. A.* 18A:58-2.

tax resources per enrolled pupil, categorical aid should fall as it is specific rather than equalizing. The position asserted is that it is subject to the same condemnation we visited upon minimum support aid under Bateman in the 1975 *Robinson* decision.

The argument has a certain plausibility. All of the items under categorical aid may be said broadly to subserve the function of education. If absence of equalization of state aid among districts, or inadequate equalization, is a presumptive hallmark of lack of a thorough and efficient system, why should not the principle of equalization apply to the categorical aid programs as well as to current expenses or to debt service and capital outlay?

Answers to the query posed can be bottomed on two grounds: (a) the logic of the equalization argument can be overextended; (b) there are colorable reasons, well within legislative policy judgment, for structuring categorical aid along specific rather than equalizing grounds.

First, the view that absence of full equalization of tax resources per pupil is the sole and absolute criterion of whether the demands of the Education Clause are met is not that here espoused. Such absence is regarded as one presumptive albeit major, contributor to such default. In that light, it is necessary to analyze the rationale of making some kinds of aid specific rather than equalizing before one can determine whether the legislative objective warrants stamping the programs as effectively denying equality of educational opportunity and therefore meriting judicial condemnation.

A glance at the special class weightings set forth in Section 20 (see note 7, *supra*) suffices to demonstrate that these all involve abnormal pupils, having in one way or another special handicaps in respect of educability and entailing special attendant expense. No conclusive reason is seen why the legislative policy judgment to make specific compensation to the district on account of such extraordinary special-expense factors, as a logical alternative to the "weighted pupil" concept

of Bateman, should be deemed fatal to basic equality of educational opportunity.

The case is even stronger for state aid for transportation expense. This is not an "educational" expense in any direct sense. *Cf. West Morris Reg. Bd. of Ed., et al. v. Sills, et al.,* 58 *N. J.* 464, 474 (1971). Without aid, districts are peculiarly burdened or relieved in this regard by the fortuitous circumstance of the distance from school to home of enrolled pupils. Urban districts have substantially less such expense per pupil than rural districts. It seems entirely reasonable for the Legislature to decide to defray such specific costs as and where they accrue. No impingement upon the Education Clause is discerned. See *West Morris Reg. Bd. of Ed., et al. v. Sills, et al., supra.*

## F.

As noted above, plaintiffs take exception to the "State support limit" at the 65th percentile net current expense budget per pupil statewide, as well as to the use of the prebudget year for this purpose. The point made is simply stated. Districts require funding for the current budget year. Prebudget years are, in these times, about 8% to 10% below current budget years. Moreover, if a district's actual needs run above the State 65th percentile of all districts, aid should be geared to the subject district's needs, not limited to the arbitrary 65th percentile.

Although it has been stated that these are relevant considerations in determining whether the act provides adequate equalization of valuations, nevertheless, in the context of an assumption that there will be an adjustment of the equalization base to an acceptable level, these matters are regarded as legislative policy determinations, legitimately influenced to some extent by administrative considerations. As to use of the prebudget year, the actual current expense budget for that year is known when current budget making is going on. The current budget is then only in a formative and un-

certain state. Administrative convenience is thus served by using the prebudget year.

As to the 65th percentile, this represents a policy judgment as to what a fairly representative district should spend, liberally raised from the median of all districts — a measure the Legislature could have adopted — to one somewhat above that. Given adequate equalization in other aspects of the formula (see *supra*), no constitutional infirmity is perceived in the use of the 65th percentile in and of itself.

## VIII

The matter of final concern is that of remedies. No point is seen in extended discussion of this subject in light of the fact that the views expressed above as to the merits of the controversy are not in all respects those of a majority of the court. As a practical matter, one's approach to the matter of remedies must be geared to today's decision of the court that the 1975 act is in all respects valid and that the order of the court of May 23, 1975 is set aside. In that light, and accepting the majority affirmation that the court's declaration of validity of the 1975 act assumes full funding of the act for the school year 1976-1977, the writer expresses his complete joinder in the court's determination that the act must be fully funded. Accordingly, he joins in Part IV of the majority opinion wherein the court retains jurisdiction of the cause for the purpose of applying sanctions to enforce full funding of the 1975 act for the school year 1976-1977.

. EXHIBIT 6: COMPARISON OF CURRENT EXPENSE LOCAL TAX RATES – 1975-76 ACTUAL AND THREE PLANS
Comparable Tax Levies and Rates Were Obtained by Using In All Columns 1976-77 Projected Net Operating Budgets of 109% of 1975-76 Net Operating Budgets

| %ile | District | E.V. Per Pupil | CURRENT EXPENSE EFFECTIVE TAX RATES | | | | TAX RATES PER $100 N.O.B./PUPIL | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1975-76 Actual (1) | 1975 Act (2) | Bateman-Tanzman (3) | Court Order (4) | 1975-76 Actual (5) | 1975 Act (6) | Bateman-Tanzman (7) | Court Order (8) |
| 1 | Camden City | $20,401 | $2.42 | $2.10) | $1.46) | $1.26 | $.188 | $.147 | $.215 | $.150 |
| 3 | Willingboro | 27,633 | 2.52 | 1.99) | 2.31) | 1.84 | .193 | .137 | .213 | .147 |
| 5 | Jersey City | 33,661 | 2.30 | 1.99)1.90 | 1.93)1.91 | 1.58 | .167 | .131 | .213 | .148 |
| 7 | Millville | 34,051 | 1.75 | 1.40) aver. | .1.53)aver. | 1.30 | .172 | .131 | .213 | .148 |
| 9 | Penns Grove-Upper Penns Nk. | 36,751 | 2.90 | 2.02) | 2.32) | 1.86 | .213 | .129 | .213 | .148 |
| 11 | Manalapan Englishtown Reg. | 39,483 | 2.46 | 1.79) | 2.50) | 1.98 | .196 | .127 | .212 | .148 |
| 13 | Vineland | 42,225 | 1.75 | 1.49) | 1.68) | 1.40 | .160 | .126 | .213 | .147 |
| 15 | Hammonton. | 43,816 | 2.17 | 1.67)1.57 | 2.00)2.01 | 1.63 | .173 | .125 | .213 | .148 |
| 17 | Lambertville | 46,181 | 1 75 | 1 35)aver. | 1.76)aver. | 1.54 | .183 | .125 | .199 | .147 |
| 19 | Northfield | 47,544 | 1.96 | 1.56) | 2.10) . | 1.75 | .180 | .124 | .205 | .147 |
| 21 | Bellmawr | 49,647 | 1.79 | 1.40) | 1.79) . | 1.52 | .177 | .123 | .207 | .148 |
| 23 | East Greenwich | 51,719 | 2.23 | 1.49) | 2.04) | 1.80 | .197 | .122 | .194 | .148 |
| 25 | South Bound Brook | 52,774 | 2.35 | 1.87)1.56 | 2.45)2.02 | 1.96 | .162 | .122 | .211 | .148 |
| 27 | Oldmans | 54,440 | 1.94 . | 1.74)aver. | 2.17)aver. | 1.83 | .155 | .122* | .201 | .148 |
| 29 | Prospect Park | 55,644 | 1.72 | 1.32) | 1.64) | 1.51 | .178 | .122 | .192 | .148 |
| 31 | Lenape Reg. | 56,378 | 2.14 | 1.77)- | 2.00) | 1.63 | .150 | .121 | .213 | .148 |
| 33 | Riverside | 57,424 | 2.34 | 1.84) | 2.30) | 1.84 | .167 | .121 | .213 | .148 |
| 35 | Hamilton Twp. | 58,755 | 2 01 | 1 61)1.79 | 1.95)2.08 | 1.71 | .168 | .121 | .197 | .148 |
| 37 | Middle Twp. | 60,260 | 2.41 | 1 87)aver. | 2.26)aver. | 1.92 | .167 | .120 | .198 | .147 |
| 39 | New Brunswick | 60,949 | .2.14 | 1.87) | 1.91)* | 1.57 | .131 | .120 | .212 | .148 |
| 41 | Belvidere | 62,235 | 2.58 | 2.02) | 2.40) | 2.21 | .167 | .121 | .180 | .148 |
| 43 | Roselle Park | 64,348 | 1 89 | 1 68) | 1.89) | 1.82 | .147 | .120 | .176 | .148 |
| 45 | Clinton Twp. | 66,263 | 2.20 | 1.80)1.69 | 2.02)1.89 | 2.16 | .156 | .119 | .156 | .148 |
| 47 | -Toms River | 66,791 | 1.91 | 1 63)aver. | 1.76) | 1.74 | .148 | .119 | .174 | .148 |
| 49 | Sussex-Wantage Reg. | 68,663 | 1 60 | 1.33) | 1.37)aver. | 1.52 | .154 | .119 | .158 | .148 |
| 51 | Wall Twp. | 70,290 | 2 10 | 1 82) | 1.92) | 1.99 | -.147 | .119 | .162 | .148 |
| 53 | Hamilton Twp. | 70,907 | 1 55 | 1.38)1.80 | 1.37)1.80 | 1.41 | .141 | .118 | .173 | .148 · |
| 55 | Lopatcong | 72,619 | 1.74 | 1.47)aver. | 1.47)aver. | 1.69 | .146 | .118 | .150 | .148 |
| 57 | Bayonne | 75,261 | 1 94 | 1.82) | 1.79) | 1.88 | -.140 | .118 | .162 . | .148 |
| 59 | Montclair | 76,624 | 2.40 | 2 49) | 2.45) | 2.60 | .131 | .120 | .153 | .148 |
| 61 | New Providence | 78,501 | 2.00 | 1.96) | 1.92) | 2.16 | .134 | .116 | .144 | .144 |
| 63 | Pascack Valley Reg. | 78,934 | 2.48 | 2.28) | 2.26 | 2.27 | .134 | .114 | .165 · | .148 |
| 65 | West Deptford | 81,197 | 1 54 | 1.35)1.89 | 1.31)1.85 | 1.54 | -.135 | .108 | .142 | .142 |
| 67 | Pennsauken | 82,232 | 1.65 | 1.68)aver | 1.62)aver. | 1.86 | .122 | .110 | .148 | .148 |
| 69 | Madison | 83,509 | 2.09 | 2.16) | 2.13) | 2.35 | .119 | .110 | .138 | .137 |
| 71 | Nutley | 85,469 | 1 56 | 1 50) | 1 46) | 1.68 | .122 | .104 | .135 | .135 |
| 73 | Holmdel | 88,259 | 1 99 | 1.75) | 1.72) | 1.92 | .116 | .103 | .125 | .125 |
| 75 | Berkeley Heights | 91,241 | 1.78 | 1.76)1.62 | 1.73)1.58 | 1.91 | .120 | .101 | .112 | .112 |
| 77 | Branchville | 93,949 | 1.88 | 1.58)aver. | 1.54)aver. | 1.73 | .117 | .097 | .113 | .113 |
| 79 | Hawthorne | 100,250 | 1.46 | 1.50) | 1.47) | 1.65 | .097 | .091 | .113 | .112 |
| 81 | Tewksbury | 102,961 | 1.25 | 1 22) | 1.20) | 1 36 | .093 | .087 | .099 | .099 |
| 83 | Fairview | 104,789 | 1.16 | 1.19) | 1.15) | 1.33 | .086 | .085 | .109 | .110 |
| 85 | Hanover Park Reg. | 112,387 | 1 88 | 1.81)1 25 | 1.80)1.23 | 1.99 | .094 | .081 | .116 | .116 |
| 87 | Lyndhurst | 121,229 | 1 03 | .99)aver. | .96)aver. | 1.12 | .085 | .073 | .096 | .096 |
| 89 | Ocean Twp. | 128,747 | 1 02 | 1.04) | 1.02) | 1.16 | .073 | .070 | .090 | .089 |
| 91 | Princeton Reg. | 145,705 | 1.47 | 1 50) | 1.48) | 1.61 | .070 | .064 | .077 | .077 |
| 93 | Cranbury | 171,697 | 1.61 | 1.65) | 1.62) | 1.73 | .065 | .055 | .069 | .069 · |
| 95 | Fort Lee | 219,083 | 1.05 | .92)1.01 | .90)1.01 | .99 | .053 | .042 | .051 | .051 |
| 97 | Bedminster | 272,363 | .82 | .74)aver | .82)aver. | .89 | .042 | .031 | .042 | .042 |
| 99 | Stone Harbor | 1,073,027 | .25 | . .25) | .24) | .26 | .010 | .009 | -.011 | .011 |

PASHMAN, J. (dissenting).

## *INTRODUCTION*

The Court has chosen to consider and review the constitutionality of the Public School Education Act of 1975, *L.* 1975, *c.* 212 (1975 Act). Intended as a legislative response

to the Court's May 1975 order, *Robinson v. Cahill,* 69 *N. J.* 133 (1975) (*Robinson IV*), the 1975 Act introduces a new phase in the four-year progression of this case. Unlike the earlier hearings on this matter, the Court passes judgment on an alternative to the State School Aid Law of 1954, as amended, *L.* 1954, *c.* 85; *N. J. S. A.* 18A:58-1 *et seq.* (Bateman Act) as the means for securing a "thorough and efficient" education in compliance with the education clause of the Constitution of 1947, *N. J. Const.* (1947), Art. VIII, § IV, ¶ 1. In so doing, the Court must decide if the 1975 Act transcends constitutional infirmities which were found in its predecessor. Similarly, it must determine whether the Act meets the standards which were posited in the Court's earlier efforts to define the parameters of a "thorough and efficient" system of free public schools.

Despite the unique posture of this case, it must be evaluated in the light of our previous holdings. In *Robinson v. Cahill,* 62 *N. J.* 473 (1973) (*Robinson I*), New Jersey's system of financing public education, which relies heavily on local taxation, was found to be unconstitutional and inconsistent with the constitutional mandate of a "thorough and efficient" system of public education. Recognizing the confusion which would have resulted from the sudden imposition of a new statewide scheme of financing public education, the Court deferred judicial action to permit the Legislature to correct the objections noted by the Court in its original opinion. *Robinson v. Cahill,* 63 *N. J.* 196 (1973) (*Robinson II*). Nonetheless, to assure expeditious implementation of a constitutional system, the Court chose December 31, 1974 as a deadline for legislative compliance and retained jurisdiction to afford judicial relief should it be warranted by the circumstances. Such a need became apparent early last year in the absence of definitive action by the Legislature. *Robinson v. Cahill,* 67 *N. J.* 33 (1975) (*Robinson III*). While the Court declined taking immediate action in deference to alleged exigencies in the school budgetary

process, it scheduled a hearing for March 1975 to determine the means by which relief could be afforded. This resulted in the Court's most recent opinion which ordered that funds earmarked for the minimum aid support and save-harmless provisions of the Bateman Act be distributed according to the incentive equalization aid formula of that Act. *Robinson IV, supra,* 69 *N. J.* at 150, 155. Because the Court itself acknowledged that the interim order was only a temporary solution and was far from a perfect plan (69 *N. J.* at 151), its continued effectiveness was made "subject to the contingency set forth in this opinion, namely the possible eventuation of timely and constitutionally appropriate legislative action." 69 *N. J.* at 155.

This judicial invitation to legislative action was accepted by the Legislature and resulted in the passage of the 1975 Act — the focal point of the instant case. The ostensible purpose of the 1975 Act is, as enunciated in its prefatory paragraph, to provide:

[F]or a thorough and efficient system of free public schools, a State aid program implementing such system, revising parts of the statutory law and supplementing Title 18A of the New Jersey Statutes.

To achieve this purpose, the Act relies on a two-pronged effort consisting of the reformation of public school financing and the formulation of a much-needed definition of "thorough and efficient." The first of these objectives is undertaken in the Act itself, whose Article III purports to rectify the constitutional objections found in the Bateman Act. While the guidelines for defining a "thorough and efficient" education are similarly included in the 1975 Act under Article II, their implementation is primarily delegated to the State Board of Education and its local counterparts. See *infra,* at 520. We are now asked to rule upon the constitutional validity of this Act.

In a letter to the Court dated September 29, 1975, Governor Brendan T. Byrne wrote: "I herewith respectfully submit the 'Public School Education Act of 1975' for your review to determine whether it complies with the constitutional mandate and may be permitted to go into effect for the next school year." Thereafter, the parties filed motions for relief with respect to our May 1975 order (*Robinson IV*).

While this Court, consistent with constitutional and regulatory limitations, has held that it "will not render advisory opinions or function in the abstract" (*Crescent Park Tenants Ass'n v. Realty Equities Corp. of N. Y.*, 58 N. J. 98 (1971)), I do not believe that this doctrine precludes consideration of these motions. None of the objections addressed by this doctrine appears to exist in the instant matter. The parties before the Court are the same as in the earlier hearings; their claims are consistent with those which they previously advanced; and the issue upon which they seek judicial determination — the constitutionality of New Jersey's school financing system — is essentially the same as that posed in *Robinson I-IV*. Moreover, I find the actual interests of the various parties sufficiently adverse so that an objection to rendering advisory opinions would be inappropriate. Finally, the Court itself contemplated judicial review of a legislative alternative to the May 1975 order as part of this litigation. *Robinson IV, supra,* 69 N. J. at 144 n. 4. The present applications for relief from our May 1975 order represent another phase of the existing cause of action. Plaintiffs therefore need not initiate a new cause of action specifically challenging the 1975 Act.

Nevertheless, for the reasons which I set forth below more fully, I would defer consideration of the 1975 Act by this Court at this time. Instead, I would remand for a plenary hearing as to the operational effect and the constitutionality of the Act.

I

## DEFER REVIEW OF THE CONSTITUTIONALITY OF THE 1975 ACT BY THE COURT AT THE PRESENT TIME

In our most recent decision in this case, we ordered limited relief for plaintiffs by redistributing minimum aid and save-harmless funds according to the equalized aid formula of the Bateman Act. *Robinson IV, supra,* 69 *N. J.* at 150. This plan, while intended as a first step towards the elimination of inequities which had been found inherent in the Statewide system of public education was readily conceded to be both an interim resolution and far "short of a perfect plan." 69 *N. J.* at 151.

Therefore, in footnote 4 of that decision, *the majority established a contingency upon which the Court's order might be vacated*:

> If implementing legislation for financing and the attendant administrative process is completed before October 1, 1975, but not in time to permit review thereof by the Court by that date, the Court will then, in the light of the nature of the entire plan submitted, consider whether it may be permitted to go into effect for 1976-1977, with or without terms, or be deferred to subsequent years if ultimately sustained by the Court. [69 *N. J.* at 144 n. 4].

The commonsense meaning of this statement clearly conveys the Court's intention at that time:

1. Any legislative alternative to the *Robinson IV* order was to become operational only after it had been reviewed and approved by this Court. This prerequisite follows from the role which the Court established for itself in the instant case, namely, "the designated last-resort guarantor of the Constitution's command," *Robinson IV, supra,* 69 *N. J.* at 154.

2. In turn, review of any such legislative alternative was to be contingent upon submission of the proposed legislation in a form which would make thorough consideration possible. Implementing legislation for financing and the attendant ad-

ministrative regulations were to have been *completed* prior to our review. Through this requirement, we sought to avoid a review process whose hypothetical and fragmentary nature would frustrate the consideration which this legislation obviously requires and deserves.

3. To assure that any legislative alternative to the *Robinson IV* order would be forthcoming in time for preparation of the 1976-1977 school budgets, we set October 1, 1975 as a deadline for submitting the legislation. The Court did not envision that mere submission of an alternative educational plan would itself satisfy the contingency set forth in footnote 4. Our May 1975 order was to be vacated only after the Court had had an opportunity to review and, if warranted, sustain the statute.

4. Accordingly, the Court reserved the option either to permit any submitted legislation to be effective immediately or to defer implementation and subject the legislation to further consideration. To suggest that the Court did not retain this option would be to negate the Court's powers of review in this case and would further contradict the language of the *Robinson IV* footnote in which we expressly reserved such an option.

Therefore, in *Robinson IV* the Court not only established the basis and scope of its review of any legislative alternatives, but also the posture in which such legislation would have to be presented before review could proceed. Tracking the language of footnote 4, the legislation would have to be an "entire plan" for which the "implementing legislation for financing and the attendant administrative process [had been] completed." *Robinson IV, supra*, 69 *N. J.* at 144 n. 4. Consequently the Court must first address itself to the threshold question of whether the 1975 Act is in an appropriate posture for review.

The 1975 Act was enacted on September 29, 1975, two days before the October 1, 1975 deadline fixed by this Court in *Robinson IV*. Although the Act contained provisions concerning the distribution of State school aid (Article III)

and provisions defining, in general terms, the contours of a thorough and efficient system of education (Article II), no regulations had been promulgated to implement the Act and no moneys had been appropriated to fund it at the time of its enactment. In light of the contingencies set forth in footnote 4, plaintiffs and supporting *amici* argued before us that the Act was not in a proper posture for review.

In choosing to review the facial constitutionality of the 1975 Act, the majority today rejects this contention. With respect to the argument that "attendant administrative" regulations must be completed prior to review, the majority observes that:

> Whether they are valid and adequate must await later determination and in no event can directly affect the constitutionality of the Act. [*Ante*, at 454 n. 2].

Accordingly, the majority confines its examination to the *facial* constitutionality of the Act and abandons all questions concerning the adequacy of its subsequent operational impact. *Ante,* at 454. The concurring and dissenting opinion of Judge Conford agrees with this proposition. I find such partial and intermittent review to be both unsupportable and inappropriate in the instant case.

First, the issue before the Court is *not* whether the 1975 Act contravenes some constitutional guarantee or proscription, but whether it *fully comports* with the constitutional mandate imposed upon the State by the education clause. *N. J. Const.* (1947), Art. VIII, § 4, ¶ 1. To review the Act in a piecemeal fashion, as the majority has done, constitutes a clear retreat from *Robinson I,* where we held:

> Whether the State acts directly or imposes the role upon local government, *the end product must be what the Constitution commands.* A system of instruction in *any district* of the State which is not thorough and efficient falls short of the constitutional command. Whatever the reason for the violation, the obligation is the State's to rectify it. If local government fails, the State government must compel it to act, and if the local government cannot carry

the burden, the State must itself meet its continuing obligation. [62 *N. J.* at 513; emphasis added].

We repeat that if the State chooses to assign its obligation under the 1875 amendment to local government, the State must do so by a plan *which will fulfill the State's continuing obligation.* [62 *N. J.* at 519; emphasis added].

Obviously, an Act which is facially constitutional will not satisfy the State's continuing obligation, if the legislation fails to redress the wrongs identified in *Robinson I* or is otherwise found to be unconstitutional as applied.

Second, in *Robinson I,* this Court expressly held that the State has a constitutional duty to "define in some discernible way the educational obligation" mandated by the Constitution. 62 *N. J.* at 519. As will be discussed more fully below, the Legislature confronts this obligation in Article II of the Act. While this article purports to define the "goal" of a thorough and efficient educational system and outline the "major elements" of that system, it does so only in the broadest of terms. Consequently, administrative regulations are necessary to clarify and implement the statutory framework. The Act itself recognizes that there exists a need for regulations to fill in the broad interstices remaining in the general language of the statute. Accordingly, the Act delegates to the appropriate State and local agencies the tasks of establishing "goals and objectives consistent with legislative guidelines" and defining "standards of performance necessary to indicate achievement of the goals and objectives." § 2b(3) ; see also §§ 6, 7. Without these additional standards and objectives, the statutory scheme is neither in a proper form for review nor constitutionally sufficient. In this last respect, the instant case is analogous to cases where implementing regulations were found to be a prerequisite to judicial review because, without such regulations, the statutory mandates were too vague and too general to permit judicial construction and interpretation. *United States v. Boyd,* 491 *F.* 2d 1163, 1169–70 (9 Cir. 1973); *United States v. Approximately 633.79 T. Yellowfin Tuna,* 383 *F. Supp.* 659 (S. D.

Cal. 1974) ; *Amalgamated Meat Cutters, etc. v. Connally,* 337 *F. Supp.* 737, 758 (D. D. C. 1971).

Third, the amorphus guidelines of Article II, standing alone, give little insight to the courts which must interpret them and little guidance to the local boards which must comply with them. The reviewing court is afforded scant assistance in determining the proper bounds of administrative discretion and the Act's constitutional sufficiency. Similarly, the absence of regulations prevents the Court from determining the adequacy of the fiscal provisions of Article III. Standards of educational quality are needed in order for the Court to ascertain whether the State school aid formulae comply with constitutional dictates. Moreover, without attendant administrative regulation, the 1975 Act might well approach a level of constitutional vagueness. *Giaccio v. Pennsylvania,* 382 *U. S.* 399, 86 *S. Ct.* 518, 15 *L. Ed.* 2d 447 (1966) ; *Keyishian v. Bd. of Regents,* 385 *U. S.* 589, 87 *S. Ct.* 675, 17 *L. Ed.* 2d 629 (1967) ; *Tinker v. Des Moines Ind. Community School Dist.,* 393 *U. S.* 503, 89 *S. Ct.* 733, 21 *L. Ed.* 2d 731 (1969).[1]

Finally, review of the Act under these circumstances directly contradicts both the language and intent of this Court,

---

[1] It should be noted that the implementation of the 1975 Act without promulgation of sufficiently specified statewide goals and standards could raise problems in yet another respect. Failure to adequately formulate such goals and standards potentially exposes local school districts to State intervention under the remedial provisions of Art. II (§§ 14, 15) based upon *ad hoc* determinations rather than upon pre-existing, properly published and adequately defined standards to which local boards might conform their actions. Nothing in the 1975 Act itself enables a local school district to determine whether it is operating a "thorough and efficient" system of public schools. Standards of due process and administrative fairness, therefore, might require that regulations be promulgated before the act goes into effect. *Morton v. Ruiz,* 415 *U. S.* 199, 94 *S. Ct.* 1055, 39 *L. Ed.* 2d 270 (1974) ; Davis, "Some Administratvie Law Surprises in the Ruiz Case," 75 *Colum. L. Rev.* 823, 827–28 nn. 26, 27 (1975). *Cf. Avant v. Clifford,* 67 *N. J.* 496 (1975) ; *Donaldson v. North Wildwood Bd. of Education,* 65 *N. J.* 236 (1974).

as expressed in footnote 4 of *Robinson IV*. 69 *N. J.* at 144 n. 4.

For these reasons, I find that promulgation of attendant administrative regulations is a prerequisite for both review of this statute and its constitutionality.[2] As previously noted, at the time motions were filed initiating the current phase of this litigation the State Board had not yet promulgated regulations implementing the Act. However, I now take judicial notice that on January 7, 1975 these regulations were officially promulgated (Reg. 1976 docket #3). Therefore, at least with respect to this requirement, the 1975 Act is now ripe for review.

As noted in footnote 4, fiscal implementation is just as important a prerequisite to a valid legislative scheme as administrative regulations. Consequently, one might similarly require full funding as a condition to judicial consideration of the Act. However, the practicalities and difficulties of the legislative process impel me to the contrary. Within the timetable which I set out below, such a task could not realistically be accomplished prior to a plenary hearing. Thus, I would permit the trial court to consider this legislation for which regulations have been promulgated even though the funding necessary for its operation has not yet been appropriated. I would, however, as does the majority, retain full funding as a condition precedent to finding the Act constitutional.

---

[2]The Chief Justice appears to concur in my view that the constitutionality of the Act is conditioned upon "the final promulgation of standards and regulations effective to fulfill the legislative purpose and meet the constitutional norm." *Ante*, at 470 (Hughes, C. J. concurring). Nevertheless, he joins the majority in deciding to review and then sustain the facial constitutionality of the Act, even though said majority fails to give any consideration whatsoever to the administrative regulations of the Act. Review of constitutional validity of the 1975 Act must necessarily entail an examination of these implementing regulations. See *infra*. Part III(A).

II

## REMAND CASE TO TRIAL COURT FOR DEVELOP-MENT OF A FACTUAL RECORD

Although I find that the 1975 Act is now in a proper posture for review, I nonetheless would defer such review by this Court and would instead remand to the trial court for development of a factual record as to the operational effect and constitutionality of the Act. This course of action, which would include a timetable to facilitate consideration of the remand, is one which I have previously advocated in our efforts to adduce the content and meaning of a "thorough and efficient" education. *Robinson IV, supra,* 69 *N. J.* at 162–65 (Pashman, J., dissenting). I find such a remand to be necessary if the Court is to avoid rendering a hypothetical and fragmentary decision based on an outdated and sketchy record.

A combination of the passage of time, the paucity of factual data and the new subject-matter of this litigation contribute to the need for an updated factual record. When the constitutionality of this State's system of financing public education first came before this Court in 1973, we were presented with both a voluminous factual record and a concise but comprehensive summary of factual findings. *Robinson v. Cahill,* 118 *N. J. Super.* 223 (Law Div. 1972). These findings concerned, among other things, levels of state funding, the ability of local districts to provide additional funding, deficiencies in the system, disparities in local expenditures per pupil, and ultimately, the constitutional infirmities which were inherent in the State's school financing scheme. The record which was thus compiled, afforded a factual basis for the resolution of the pertinent legal issues.

While the data which was analyzed in that early decision may still provide a starting point for transitional studies, its continued usefulness is mitigated by factors of timeliness and relevance. If nothing else, the passage of so many years casts

a pall of antiquity on the 1971 statistics and the conclusions which can be drawn from them. Due to the unavailability of certain statistics at the time, much of the evidence originally presented to the trial court was not even current when first submitted. 118 *N. J. Super.* at 236.

More importantly, the very relevance of the 1971 information has been undermined by the introduction of an entirely new legislative scheme. The information which was compiled to evaluate the Bateman Act is not only outdated, but is of limited use in evaluating those provisions and formulae of the 1975 Act which differ from the earlier legislation. In short, the inability of this information to reflect changed circumstances undermines its utility in the present proceedings.

Finally, without a remand, our evaluation of the 1975 Act may be effectively frustrated due to the lack of available information concerning the costs involved in satisfying the constitutional standard for public education. Of the statistical data before the Court, only that presented by the Commissioner of Education can even pretend to be current. This information, however, is itself fragmentary and lacks the probity necessary to be persuasive. Furthermore, while the figures which the Commissioner has presented represent an impressive array of statistics, their relevance has gone unexplained and their accuracy unchallenged. In addition, other information which might be of equal importance may have been overlooked.

I would therefore remand for a plenary hearing on the constitutionality of the 1975 Act. The plenary hearing which I recommend would perform the following functions:

1. It would be supplementary in the sense of augmenting the factual record which was developed in 1972. This would, of course, necessitate the presentation of revised figures for such items as the equalized non-school and total (school and non-school) tax rates, current Statewide and local per pupil expenditure levels, the ratios of teachers, other staff, facilities and programs to pupils in each district and the cost of pro-

viding essential services and programs. It would also require an assessment of the steps which have been taken to cure the deficiencies which were previously recognized.

2. The hearing would perform an evidentiary function by eliciting information particularly related to the operations and implementation of the 1975 Act. This would permit the collection of data concerning provisions of the Act which were either absent from its predecessor or altered to some degree.

3. At the heart of the hearing would be an evaluative function, which would determine whether the 1975 Act comports with the constitutional mandate to provide a "thorough and efficient" system of education. While the imagination can suggest numerous avenues of inquiry, at the very least, the trial court should consider whether the level of funding and State aid formulae under the 1975 Act are sufficient to assure adequate per pupil expenditure levels; whether local tax resources per pupil are sufficiently equalized; whether the implementing regulations sufficiently define the content of the constitutional educational opportunity; whether the Act proves an effective mechanism for compelling deficient or recalcitrant districts to comply with statewide standards; and whether specific problems, such as municipal overburden, the absence of weighting factors, use of the prebudget years, and the State support and spending increase limits, undermine the Act's constitutionality. See *infra* Part III.

I should note that the majority is not blind to the considerations that I have listed which impel me to remand for an evidentiary hearing. On the contrary, it explicitly states:

We hesitated to entertain the motions. No lower court determination of this underlying issue was before us for review; the parties had had no opportunity to avail themselves of an evidentiary hearing at which a record could be made . . . [*Ante*, at 454]

Nevertheless, the majority proceeds to review the constitutionality of the Act, on the ground that these considerations are "outweighed by the desirability of reaching a speedy

decision as to the constitutionality of the enactment." *Ante,* at 454. Judge Conford agrees with the majority on this point, adding in his separate opinion that a "great amount of work, study, consultation and money has been invested," that the "public educational establishment . . . has been in a state of tension and uncertainty . . . during the period of this litigation" and that "[p]lanning has periodically been disorganized and frustrated." *Ante,* at 499, 500.

While these considerations may be legitimate, I cannot agree that they justify a hasty review of the Act, in a partial and intermittent fashion and on the basis of an incomplete and seriously outdated record. *Nor do they justify prematurely placing this Court's imprimatur on an unfunded, incomplete and constitutionally suspect act.* As I have noted on another occasion, the possibility of "administrative confusion," "tension" and "uncertainty" does not warrant acceptance of a less-than-adequate legislative scheme for the financing of public education:

> A certain amount of confusion and a great deal of dissatisfaction would undoubtedly result. . . . [But] the real question is: Can this Court, consistently with its obligations to uphold and to enforce the Constitution, trade the constitutionally guaranteed rights of hundreds of thousands of children to an equal educational opportunity for the possibility of avoiding some difficulties in meeting local budget-making deadlines. I do not see how this question can be answered in any way but in the negative. [*Robinson III, supra,* 67 *N. J.* at 43].

See also *Robinson IV, supra,* 69 *N. J.* at 167–168 (Pashman, J., concurring and dissenting). *Cf. Cleveland Bd. of Ed. v. LaFleur,* 414 *U. S.* 632, 646, 94 *S. Ct.* 791, 39 *L. Ed.* 2d 52 (1974); *Frontiero v. Richardson,* 411 *U. S.* 677, 690, 93 *S. Ct.* 1764, 36 *L. Ed.* 2d 583 (1973). Moreover, as I stated in *Robinson IV,* when a legislative scheme does not fully comply with the constitutional mandate, it should not be sustained by this Court no matter how much "work, study, consultation and money" has been invested:

The obligation [of providing a thorough and efficient system of education] is not met by unsuccessful efforts by the legislative and executive branches to devise a plan to achieve the results demanded by the Constitution, however arduous and bona fide those efforts may have been. To the children of New Jersey it matters not at all whether the State's failure to provide the constitutional opportunities guaranteed by the Constitution is the consequence of a deliberate policy of intransigence or merely the by-product of deadlock within the coordinate branches of government. [69 *N. J.* at 173].

I do not believe that the majority has acted in the best interest of the school children of this State by finding the 1975 Act to be facially constitutional, in the absence of a full evidentiary examination of its operational effect. I cannot see how sanctioning an act which is constitutionally questionable will serve the interests of those children. Were the Act to be held unconstitutional after a plenary hearing or were there to be insufficient time in which to fully review the Act prior to the upcoming school year, the Court could still protect the interests of New Jersey's school children by issuing a remedial order to continue in effect until such time as the Legislature corrected the deficiencies in the Act or the Court completed its review of the Act, respectively. Issuance of interim, remedial orders to redress the violation of constitutional rights is undeniably within the power of this Court. *Robinson IV, supra,* 69 *N. J.* at 146–147, 152 (and cases cited therein). In light of this alternative course of action (see *infra* Part IV), ill-considered and premature approval of the 1975 Act seems both unnecessary and conceivably detrimental to the very pupils whom the majority wishes to help.

Nevertheless, I too believe that the matters before us should be resolved as expeditiously as possible and that a constitutionally adequate system of public education should be implemented at the earliest possible date. Therefore, I would propose that the evidentiary hearing and all subsequent review should proceed in accordance with a strict timetable which would assure completion of the review in a fairly expeditious fashion. Accordingly, I would schedule the plenary

hearing to begin on or about February 16, 1976 and to be completed by March 1. The hearing would solicit presentations by the parties and *amici* now before the Court, as well as others should the trial court determine the necessity or relevance of additional information. The hearing would result in a decision by the court which should be filed by March 10. On the basis of the decision, this Court could then properly consider and hear oral arguments on the constitutionality of the Act on or about March 22 and a decision would be rendered on or about April 15.

The timetable which I have proposed is admittedly one which places a premium on expeditious action and a burden on the parties who must make factual presentations. The first of these "can be ameliorated by diligence on the part of the State and local officials." *Robinson III, supra,* 67 *N. J.* at 43 (Pashman, J., dissenting). That the timetable would still permit State and local school officials to prepare their 1976–77 school budgets has been acknowledged by the majority itself which has also selected April 15 as a date for concluding judicial review in the event that the 1975 Act is not fully funded. Timetables for budget deadlines were pushed back last year. *Robinson III, supra,* 67 *N. J.* at 42. If necessary, this may be done again this year.

## III

### REVIEW OF THE CONSTITUTIONALITY OF THE 1975 ACT

As just noted, I would have deferred ruling upon the constitutionality of the 1975 Act and, instead, would have remanded for an evidentiary hearing. The majority has rejected this approach and has chosen to review the Act. Having registered my dissent regarding the majority's decision to examine the facial constitutionality of the Act at this time, I could stop here. However, two very important considerations impel me to comment further on the constitutionality of this legislation.

First, in their briefs and at oral argument, plaintiffs and supporting *amici* raise numerous objections to the constitutional validity of certain portions of the 1975 Act. They vigorously attack some provisions as being facially unconstitutional. They contend that others might be shown to be invalid-as-applied. Consideration of their contentions is conspicuously absent from the majority's opinion. Not only does the majority fail to address plaintiffs' and *amici's* objections to the 1975 Act, it displays a regrettable degree of temerity by not even acknowledging them. Because of this failing and because I find many of these contentions to be potentially meritorious, I feel obliged to discuss them in this portion of my dissent.

Second, by means of this discussion I hope to identify those aspects of the 1975 Act which are constitutionally suspect and, thereby, provide the trial court with guidance concerning the issues to be raised at the plenary hearing. I also hope to provide some criteria upon which the trial judge may test the constitutional bouyancy of the Act.

I will first examine the objections raised by plaintiffs and *amici* with respect to Article II of the Act and then analyze their contentions regarding Article III.

A. *Article II of the 1975 Act: Goals, Standards and Guidelines: Procedures of Evaluation: Enforcement*

In *Robinson I,* this Court held that, as part of the State's continuing obligation to provide for a thorough and efficient system of free public schools, the State must define the content of the educational opportunity required by the Constitution. Specifically, the Court stated:

> We repeat that if the State chooses to assign its obligation under the 1875 amendment to local government, the State must do so by a plan which will fulfill the State's continuing obligation. To that end the State must define in some discernible way the educational obligation . . . The State has never spelled out the content of the constitutionally mandated educational opportunity. [62 *N. J.* at 519]

As the majority correctly observes, the Legislature finally undertakes to do this in Article II of the 1975 Act. *Ante,* at 456.

Section 4 of that article defines the overall goal of a thorough and efficient system by stating that said goal

. . . shall be to provide to all children in New Jersey, regardless of socioeconomic status or geographic location the educational opportunity which will prepare them to function politically, economically and socially in a democratic society.

Section 5 elaborates upon this general statement by outlining those elements which the State system of education must contain in order to comply with the "thorough and efficient" standard. These elements, intended to serve as guidelines for implementing the Act, include, *inter alia,* establishment of educational goals at both the State and local level [§ 5a]; "instruction intended to produce the attainment of reasonable levels of proficiency in the basic communications and computational skills" [§ 5c]; efficient administration [§ 5h] and adequate evaluation procedures [§ 5j].

Article II of the 1975 Act then delegates the more detailed formulation of statewide goals and standards to the State Board of Education (State Board), after consultation with the Commissioner of Education (Commissioner) and review by the Joint Committee on the Public Schools. [§ 6]. It further delegates establishment of local educational goals, objectives and standards to the local boards of education (local boards). [§ 7]. Finally, Article II provides for periodic review of these statewide and local goals and standards [§§ 8, 9], for additional monitoring procedures [§§ 10, 11, 12] and for remedial powers to be used when necessary to correct deficiencies in the system. [§§ 14, 15, 16].

The majority blithely reviews these provisions and concludes:

What is meant by a thorough and efficient education has now been defined; the goal of such an education has been stated; the elements of which it is to consist have been enumerated [*Ante*, at 463].

The majority reaches this conclusion without any consideration whatsoever of the attendant regulations of the Act. *Ante*, at 454 n 2. I agree that the provisions of Article II, when viewed separately, do not transgress the constitutional precepts previously enunciated by this Court (*e. g.*, *Robinson I, supra*, 62 *N. J.* at 515), and that the delegation of responsibility contained therein is clearly permissible.[3] *Robinson I, supra*, 62 *N. J.* at 510; *Ante*, at 458. However, as I have stated previously, these provisions, without full regulatory implementation, are constitutionally insufficient because they fail to *fully* comport with the mandate of the education clause. *Supra* Part I.[4] Therefore, standing alone, Article II of the Act cannot be sustained. To be constitutional, the statute requires proper and complete regulatory implementation. Furthermore, the Act and its attendant

---

[3]In fact, in *Robinson IV*, I specifically noted that not only is the State Board of Education and its administrative officer, the Commissioner of Education, statutorily empowered to formulate statewide standards of educational quality and promulgate rules and regulations to implement these standards, *N. J. S. A.* 18A:4–10, 18A:4–15, 18A:4–23, 18A:4–24; *cf. L.* 1975, *c.* 212, §§ 6, 8, 9, 10, 44, but they are uniquely qualified to do so, in light of their special expertise in educational matters. *Robinson IV, supra*, 69 *N. J.* at 162–63 (Pashman, J., concurring and dissenting).

[4]In this regard, Judge Conford misconstrues the position of *amici*, Education Committee NAACP (Newark) and ACLU of New Jersey. *Ante*, at 500 (Conford, P. J. A. D., t/a, concurring and dissenting). While these *amici* readily concede the facial constitutionality of the guidelines, they should not be understood as simultaneously conceding the constitutionality of the entire 1975 Act. As the *amici* state in their brief:

There is nothing in the statute itself which would enable a local school district to ascertain whether it was operating a "thorough and efficient" system of public schools, and there is nothing which would enable the Court to determine to what degree the various local districts are failing to provide a constitutionallly adequate quality of education to their students. [*Amici* brief at 10].

regulations, when taken together, must meet additional requirements. The legality and the thoroughness of the regulations are just as important as the legality and thoroughness of the Act itself. The verbiage in the regulations is the seat of power. In accordance with my expressed efforts to assist the trial court before which a plenary hearing would be held, I set forth a series of criteria by which the recently promulgated implementing regulations may be evaluated.

## (1) *Regulations Must Be Specific.*

It is well settled that the education clause requires the State or its agents to "define in some discernible way the educational obligation" mandated by the Constitution. *Robinson I, supra,* 62 *N. J.* at 519.; *Ante,* at 456. Accordingly, they must prescribe the statewide standards of a constitutionally minimum quality education to which local school districts must adhere. These standards are especially important where the State chooses to assign much of its responsibility to local government. Without such standards there is no way of ascertaining whether school districts are, in fact, providing that level of educational opportunity which the Constitution mandates. Opinions of this Court and the provisions of the 1975 Act itself recognize the importance of establishing minimum standards of performance for measuring and evaluating the educational opportunity being afforded by local school districts. *Robinson I, supra,* 62 *N. J.* at 516, 519; *Robinson IV, supra,* 69 *N. J.* at 159–65 (Pashman, J., concurring and dissenting). *Robinson IV, supra,* 69 *N. J.* at 175–76 (Mountain and Clifford, JJ., dissenting); *L.* 1975, *c.* 212, §§ 2b(3), 5a, 6, 7. The majority as well recognizes this fact when it points out that the State must define the content of the constitutionally required educational opportunity "so that 'in some discernible way' the scope of this obligation [will] be made apparent." *Ante,* at 456. See also *Levin,* "A Conceptual Framework for Accountability in Education," 82 *School Rev.* 363 (1974). It

follows that, to fully comply with the education clause, the Act must be supplemented by State Board regulations which set forth goals and standards that are specific enough to provide a meaningful way to evaluate local efforts and measure local performance.

### (2) *Regulations Must Provide for Standards of Performance and Levels of Proficiency*

In addition to being specific, the goals and standards promulgated under § 6 of the Act must be sufficiently rigorous to guarantee that local districts are, in fact, providing the constitutionally minimum educational opportunity. The broad contours of this constitutional opportunity can be inferred from the language of our opinions. The former Supreme Court characterized the significance of the education clause as follows:

> Its purpose was to impose on the legislature a duty of providing for a thorough and efficient system of free schools, capable of affording to every child such instruction as is necessary to fit it for ordinary duties of citizenship. * * * [*Landis v. Ashworth,* 57 *N. J. L.* 509, 512 (Sup. Ct. 1895)].

In *Bd. of Ed., Elizabeth v. City Coun., Elizabeth,* 55 *N. J.* 501 (1970), this Court elaborated upon the meaning of "thorough and efficient":

> Thus it is the duty of the Commissioner to see to it that every district provides a thorough and efficient school system. This necessarily includes adequate physical facilities and educational materials, proper curriculum and staff and sufficient funds. [55 *N. J.* at 506]

Finally, in *Robinson I,* we defined the contours of a thorough and efficient system in the following manner:

> The Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market. [62 *N. J.* at 515]

In its definition of what constitutes a "thorough and efficient" education, § 4 of the 1975 Act substantially adopts the above language.

It follows that, to be constitutionally and statutorily sufficient, statewide standards must define with some degree of specificity, the minimally required programs, facilities and attendant staff which each local district must provide in order to meet the mandate of a thorough and efficient educational system. Certainly, without requisite planning, facilities and staff, provision of an "equal educational opportunity" (62 *N. J.* at 516) is impossible. Although these standards need not be rigid and inflexible (and may be subject to change in accordance with policy determinations by appropriate State agencies), they must specify, in some workable fashion, levels of constitutional adequacy for each of the above elements. § 5.

I draw special attention to one particular type of standard — standards of pupil performance. Without this type of standard it will be difficult to determine the success of individual school districts in preparing their pupils for active citizenship and productive lives. I find that, to conform to both constitutional and statutory requirements, the regulations promulgated under § 6 must contain standards of pupil performance.

These standards necessarily contemplate that the pupils of a district will attain a reasonable degree of proficiency in such basic skills as reading, writing and simple mathematics.[5] A school system which fails to impart these basic skills to its students, with at least a reasonable degree of success,

---

[5] I do not mean to imply that a "thorough and efficient" system of public education should not or need not provide its students with a reasonable degree of proficiency in non-basic skills. See, to the contrary, *Robinson IV*, where the Court opined that "a system of public education which did not offer high school education would hardly be thorough and efficient." [62 *N. J.* at 515]

is undoubtedly falling short of its obligation under the education clause.[6]

I agree with the majority that "diversity . . . will inevitably exist" among the separate school districts. *Ante,* at 459. However, this certainly does not mean that failure to assure a constitutionally minimal education to children from disadvantaged districts can be justified or tolerated on the basis of "diversity." To achieve the consistent degree of success which is contemplated by the "thorough and efficient" standard, everybody must be involved in this project — teachers, administrators, children, parents, advisors and an army of educational consultants. If this effort takes a child from a welfare family living in a city slum, places him in a classroom and thoroughly and efficiently overcomes the education he is getting in the streets, New Jersey will be proud of its commitment to the equality of all people.

Formulation and enforcement of minimum standards of pupil performance are particularly important in light of recent findings by the National Assessment of Educational

---

[6]In stating that local school districts must show a "reasonable degree of success" in imparting to their students certain necessary and fundamental skills, I do not intend to imply that the education clause requires of the State educational system that *every* student be able to meet prescribed levels of proficiency, although such a goal is certainly laudable. Rather, I envision that after establishing statewide minimum "levels of proficiency," in each of the "basic skills," either the State Board or some other appropriate agency will formulate "levels of success" which local school districts must meet in order to avoid sanctions under §§ 14, 15 and their implementing regulations. *N. J. S. A.* 18A:7A–14, 15. Such "levels of success," which necessarily will be somewhere below 100%, will assure that State initiated sanctions are based upon *failures in the system* rather than the failure of individual students in the "annual testing process" conducted pursuant to § 10 of the Act. Clearly, the initial responsibility for formulating the various "levels of proficiency," "levels of success," and standards of performance rests with the Legislature or, by implication, with the administrative agencies to which the Legislature delegates its authority. *N. J. Const.* (1947), Art. VIII, § IV, ¶ 1. 69 *N. J.* at 144–45. This does not mean, however, that they may abdicate this responsibility. [69 *N. J.* at 152 and cases cited therein.]

Progress which reveal alarming reductions in levels of writing performance among our youth and in light of the severe inadequacies found by the trial court to exist in many of New Jersey's school districts. 118 *N. J. Super.* at 248–57. The fact that disparities in levels of proficiency may stem from economic, social, geographic or racial factors — or that greater resources may be necessary to educate children with deprived backgrounds — does not justify the failure to fix such minimum standards. 118 *N. J. Super.* at 243, 252–53; *Guthrie Kleindorfer, Levin & Stout, Schools and Inequality* (1970); *McDermott & Klein,* "The Cost-Quality Debate in School Finance Litigation: Do Dollars Make a Difference," 38 *Law & Contemp. Prob.,* 415 (1974). In *Robinson I* the Court so held by stating that "[*w*]*hatever the reason* for the violation, the obligation is the State's to rectify it." 62 *N. J.* at 513 (emphasis supplied).

The necessity for promulgating standards of pupil performance and levels of proficiency derives not only from the language of our opinions but from the 1975 Act as well. In § 5, the Act specifically lists, as one of the "major elements" of a thorough and efficient system of public schools:

Instruction intended to produce the attainment of reasonable levels of proficiency in the basic communications and computational skills. [*L.* 1975, *c.* 212, § 5(c)]

That the 1975 Act ultimately considers the performance of pupils as one measure of a "thorough and efficient" system is borne out by language in Sections 2b(3), 3 [definitions of "administrative order," "goals," "objective," "standards," "state compensatory education pupil"], 8, 9, 10, 11(b), 11(d), 11(h). Section 3, for example, defines "standards" as "the *process* and *stated levels of proficiency* used in determining the extent to which goals and objectives are being met" (emphasis added). Section 10 expressly requires the Commissioner to develop and administer a "uniform, Statewide system for evaluating the performance of each school," which *"shall* be based in part on annual testing for achieve-

ment in *basic skill areas.*" § 10 (emphasis supplied). In promulgating "goals, standards and procedures," the State Board and the Commissioner must comply with these statutory mandates.

### (3) *Regulations Must Provide for Remedial Plans and Corrective Action*

Without an effective mechanism for enforcing its standards and objectives, the legislative plan for financing public education will fail to satisfy the continuing obligation of the State. Therefore, either the Act itself or its implementing regulations must provide the necessary means of enforcement.

The 1975 Act recognizes this requirement in § 2b(5) and purports to fulfill it in §§ 14 through 16. Section 14 provides that if the Commissioner, upon review of the reports and evaluations submitted pursuant to preceding sections, finds that a district has failed to show sufficient progress in reaching pertinent goals and standards, he *must* direct the local board of education to prepare and submit a remedial plan for his approval. If the Commissioner approves the plan, he then supervises its implementation; if, however, he finds the plan to be deficient, he *must* order the local board to show cause why corrective action should not be taken pursuant to § 15. Section 15 states that, if after a plenary hearing, the Commissioner still finds it necessary to take corrective action, he is empowered to "order necessary budgetary changes within the school district, . . . order in-service training programs for teachers . . . or both." Where these sanctions are inadequate, the Commissioner can recommend that the State Board take appropriate action, as follows:

. . . The State Board, on determining that the school district is not providing a thorough and efficient education, notwithstanding any other provision of law to the contrary, shall have the power to issue an administrative order specifying a remedial plan to the local board of education, which plan may include budgetary changes *or other measures the State board determines to be appro-*

*priate.* Nothing herein shall limit the right of any party to appeal the administrative order to the Superior Court. [Section 15; emphasis added]

In the event that the local board becomes recalcitrant, § 16 authorizes the State Board to obtain an order from the Superior Court directing the local school board to comply with the administrative order issued under § 15.

Identifying these remedial provisions as "crucial to the success of the legislative plan," the majority finds that they impose a continuing two-fold obligation on the Commissioner and the State Board, as the State's representatives. *Ante,* at 459. This obligation includes monitoring the content of the evolving, constitutionally mandated system and insuring "that over the years and throughout the State each pupil shall be offered an equal opportunity to receive an education of such excellence as will meet the constitutional standard." *Ante,* at 459. As the majority admits, this is a "great and ongoing responsibility." *Ante,* at 461.

The Court then enables the Commissioner and the State Board to meet this enormous responsibility by finding that they have been given "a vast grant of power" such "as may be needed to fulfill the obligation." *Ante,* at 461. On this basis, the Court rejects the contention that the power given to the State Board and the Commissioner to make "budgetary changes" does not include the power to compel an increase in local school budgets above that fixed by local authorities. Reasoning that such a limitation would undermine the State's authority to compel local districts to make the financial commitments necessary to satisfy the constitutional mandate, thereby emasculating the legislative scheme, the Court concludes:

But where it is clear that an inadequacy stems from a failure of fiscal resources, then the power given to the Commissioner and the State Board to effect changes in local budgets does include the power to increase such budgets beyond the amounts locally determined. Such power must of course be wisely exercised and any such exercise will always be subject to judicial review, but there

is no doubt that under the terms of the Act of 1975 such power exists. [*Ante*, at 462]

While I agree that, to be constitutional, the State's legislative scheme must delegate to its agents the authority to order increases in local school budgets, I doubt that the Legislature, in fact, intended to confer such power upon the Commissioner or the State Board. First, § 15 authorizes the Commissioner or the State Board to undertake "necessary budget changes" (*i. e.*, to interchange line items), but it does not expressly mention budget increases. Second, the stringent limitations imposed by § 25 on annual increases in the school budget reflect a legislative intent diametrically opposed to that found by the majority. Finally, the Act fails to specify in what manner and from whose pockets such agency-ordered budget increases are to be paid. Had the Legislature intended to confer this power upon the Commissioner or the State Board, it probably would have addressed these problems. Nevertheless, without the remedial power to increase local budgets the State would be unable to effectively ameliorate those deficiencies which arise solely or primarily from the local board's failure to prepare an adequate budget.[7]

To summarize with respect to Article II: In order to survive a constitutional challenge, Article II of the 1975 Act and its attendant regulations, taken together, must (1) formulate goals and standards of performance with sufficient specificity to provide a means for measuring and evaluating local efforts; (2) develop effective procedures for determining whether local school districts are, in fact, complying with statewide standards, including standards of pupil per-

---

[7]For similar reasons, I would also find that the State Board and the Commissioner must be empowered to direct local boards to alter or modify their goals, objectives and standards (§ 7) where such goals and standards are either inconsistent with statewide standards (§ 2b(3)) or not "visibly geared to the mandate" of a thorough and efficient educational system. *Robinson I*, *supra*, 62 *N. J.* at 516.

formance, and (3) establish a mechanism for compelling local school districts to remedy deficiencies when they fall below such standards.

### B. *Article III: State School Aid: Equalization Formula*

In addition to requiring that the State define the educational opportunity mandated by the Constitution, the education clause also demands a financial commitment on the part of the State. Specifically, the State, as part of its overall obligation, must guarantee that "local effort plus the State aid will yield to all the pupils in the State that level of educational opportunity" which the Constitution requires. *Robinson I, supra,* 62 *N. J.* at 519. Therefore, with respect to the fiscal provisions of the 1975 Act, the litmus test of constitutional validity is whether its provisions assure that each school district has adequate funds available to provide a constitutionally sufficient education for all its students. The test is *not,* as the majority contends, whether the fiscal provisions of the Act "afford sufficient financial support for the system of public education that will emerge from the implementation of the plan set forth in the statute." *Ante,* at 464. This latter test is unreliable. By presuming that the legislative plan is constitutionally valid, the test requires only that the fiscal provisions provide the plan with sufficient funding. If, however, the plan were found to be constitutionally suspect, the test would no longer be workable since the mere funding of a constitutionally deficient scheme obviously would not satisfy the State's financial commitment.

In the instant case, the State purports to satisfy its financial responsibility through the equalization support provision (§ 18) and the other State aid formulae contained in Article III of the Act. Plaintiffs and several *amici curiae* argue to the contrary that these provisions fail to comport with the State's constitutional obligation. I will discuss their contentions in the enumerated sections below.

*(1) Equalization Support for Current Expenses (§ 18);
 Equalization of Tax Resources versus Equalization
 of Per Pupil Expenditures*

Defendants and supporting *amici curiae* rely heavily upon
§ 18 for their claim that the 1975 Act alleviates the wide dis-
parities in district expenditures which have resulted from
discordancies in their tax bases and which were identified in
*Robinson I* as "the principle cause of the constitutional de-
ficiency." 62 *N. J.* at 515; see *Robinson IV, supra,* 69 *N. J.*
at 141. Because State aid for debt service and budgeted
capital outlay (§ 19) utilizes the State support formula set
forth in § 18, the following comments are equally ap-
plicable to those provisions.

Under the formula set forth in § 18, the amount of State
aid to which a district will be entitled is determined by first
dividing the district equalized valuation per pupil[8] by the
"guaranteed valuation per pupil" and then subtracting the
quotient from 1.0000. The resulting fraction is designated the
district "State support ratio." In order to obtain the exact
amount of State aid which the district will receive under this
provision, the "State support ratio" is then multiplied by the
lesser of (1) the district's net current expense budget for
the prebudget year or (2) the resident enrollment times
the "State support limit." "State support limit" is defined
as the 65th percentile net current expense budget per pupil
for the prebudget year when all districts' figures are ranked
from low to high. (§ 3). The impact which the "State sup-
port limit" has on State aid in general will be discussed
below. *Infra,* at 551. "Guaranteed valuation per pupil" means

---

[8]An equalized valuation is an aggregate assessment of district
ratables adjusted to produce an equalized or true market value for
the district. See *N. J. S. A.* 54:1–35.1 *et seq., In re Appeals of
Kents 2124 Atlantic Ave., Inc.,* 34 *N. J.* 21, 26–27 (1961). This
figure is then divided by the number of students enrolled in the
district's school system to obtain the "district equalized valuation
per pupil."

1.3 (1.35 each year after the 1976–77 school year) times the State average of equalized assessed valuations per pupil enrolled in the public schools. The intended purpose of § 18 is to make available to each student that amount of district current expenses (but not in excess of the statewide 65th percentile) which would presumably be available if the district had an equalized assessed valuation of 1.35 times the State average of assessed valuations.

The majority seems to accept § 18 as valid, almost without discussion. I find this "acceptance" to be premature and without sound justification. At least two grounds exist upon which the equalization support formula of § 18 may fall. First, this provision may not sufficiently reduce the current disparity among school districts with respect to their tax resources per pupil to adequately redress the constitutional objections identified in *Robinson I*. Second, the provision may not, in fact, guarantee constitutionally adequate dollar-inputs-per pupil for the State's poorer districts. While neither contention has been proven as a facial matter, both are sufficiently plausible to merit a full evidentiary hearing.

As to the first contention, our opinions have identified the disparity of tax resources per enrolled pupil among the school districts as one of the primary causes of current constitutional deficiencies. *Robinson I, supra,* 62 *N. J.* at 515; *Robinson IV, supra,* 69 *N. J.* at 141. Therefore, to pass constitutional muster, any legislative scheme must substantially reduce these disparities. In this regard, the 1975 Act represents an improvement over the Bateman Act. Nevertheless, it still fails to alleviate much of the disparity. For instance, although the number of districts whose tax resources are equalized by guaranteed valuations under the 1975 Act (59%)[9] substantially exceeds the number of such

---

[9]This figure would be slightly higher if one were to base these calculations on the 1.35 guaranteed ratio which is to go into effect after the 1976–1977 school year. § 18. See *Ante,* at 485 (Conford, P. J. A. D., t/a, concurring and dissenting).

districts equalized under the Bateman Act (27.2%), it still falls short of the total number of districts by 41%. Similarly, the number of pupils in such districts falls short of the total number of students by 32.7% and the aggregate equalized assessed valuations in such districts falls short of the total by 50.8%. Even if minimum support aid were to be eliminated from the Act, equalization would continue to be well below required levels. Based on these statistics, it is likely that, upon remand, the trial court will find that the 1975 Act does not achieve a sufficiently high degree of equalization among the districts to alleviate disparities. In his concurring and dissenting opinion, Judge Conford discusses this objection to the 1975 Act at length. *Ante,* at 476 – 477, 485 – 493. (Conford, P. J. A. D., t/a, concurring and dissenting). To a large extent, I am philosophically in accord with that discussion.[10]

---

[10]Apparently, the Chief Justice also agrees that, in failing to effectuate substantial equalization of tax resources per pupil, the 1975 Act falls short of a constitutional scheme. *Ante,* at 470, 473–474. Nevertheless, noting that "there is room for accommodation to the exigencies of government," he joins with the majority and would put off until another day implementation of a fully constitutional plan, vindication of the constitutional rights of New Jersey's school children and enforcement of the concept of substantial equalization among school districts. *Ante,* at 474–475. Like the majority, he seems perfectly satisfied, at this juncture, to await further action on the part of the Legislature — action which will not likely be forthcoming. With all due respect, I can wait no longer. Three years have passed since Chief Justice Weintraub memorialized in *Robinson I* the need to bring about substantial equalization of tax resources; four years have gone by since the trial court first identified these deficiencies. In *Robinson IV*, the Chief Justice himself unequivocally reaffirmed the important principles set forth in these decisions. Even in the face of such clear constitutional infirmities, this Court has exercised restraint on three separate occasions, *Robinson I, II* and *III*. For the Court to again delay would be a clear violation of this Court's duty to protect the constitutional rights of the citizens of this State and would, in fact, contribute to a profound violation of our Constitution. At this late date, "accommodation to the exigencies of government" represents a weak justification for abdicating this Court's constitutional obligation.

However, as to the second contention, I would go one step further than my dissenting Brother and require that the 1975 Act guarantee adequate and relatively equalized *expenditures per pupil* as well as equalized per-pupil tax resources.[11] This requirement stems from the principles set forth in the various opinions in this case.

In *Robinson I,* for example, "dollar input per pupil," not "guaranteed valuation per pupil" provided the primary criterion for measuring legislative compliance with the education clause. This criterion was supported by a trial court finding that there is a substantial correlation between financial input and the quality of education. 118 *N. J. Super.* *223 passim.* Although the entire discussion need not be repeated here, it is helpful to recite a portion of it:

> In most cases, rich districts spend more money per pupil than poor districts; rich districts spend more money on teachers' salaries per pupil; rich districts have more teachers and more professional staff per pupil, and rich districts manage this with tax rates that are lower than poor districts, despite "equalizing" aid . . . Other input factors include school buildings, equipment, text books and library facilities. There is ample evidence to show the correlation between wealth and the quality of these facilities, and that severe inadequacies exist in many poor districts. [118 *N. J. Super.* at 237–38, 249]

Chief Justice Weintraub, writing for the Court in *Robinson I,* expressly adopted the trial court's finding:

> . . . [I]t is nonetheless clear that there is a significant connection between the sums expended and the quality of the educational opportunity . . . Hence we accept the proposition that the quality of educational opportunity does depend in substantial measure upon the number of dollars invested, notwithstanding that the impact

---

[11]The Constitution does not require perfect equality. As a matter of constitutional fiat, such expenditures must be equal only up to levels of adequacy. Beyond that, local school districts are perfectly free to spend additional sums on its educational program through local efforts (69 *N. J.* at 141 n. 3) and State statutes may authorize them to do so. *Robinson I, supra,* 62 *N. J.* at 520.

upon students may be unequal because of other factors, natural or environmental. [62 *N. J.* at 481]

While there has been much debate concerning the degree to which expenditures on education can affect the quality of education, see *e. g., McDermott & Klein,* "The Cost-Quality Debate in School Finance Litigation: Do Dollars Make a Difference?", 38 *Law & Contemp. Prob.* 415 (1974) ; *Mosteller & Moynihan,* eds., *On Equality of Education* (1974) ; *Guthrie, Kleindorfer, Levin & Stout, Schools & Inequality* (1971) ; *Coleman, Equality of Educational Opportunity* (1966), there can be little doubt that *adequate* financing *is* a necessary condition for an effective educational system, even if not a sufficient one. *McDermott & Klein, supra* at 429–40.

Relying on these findings, Chief Justice Weintraub held that, in the absence of other relevant suggestions, the Court would evaluate State school aid legislation on the basis of its success in reducing discrepancies between school districts in their dollar inputs per pupil :[12]

The trial court found the constitutional demand had not been met and did so on the basis of discrepancies in *dollar input per pupil.* We agree. We deal with the problem in those terms because dollar input is plainly relevant and because we have been shown no other viable criterion for measuring compliance with the constitutional mandate. [62 *N. J.* at 515–16 ; emphasis added]

Although the majority recognizes this criterion, its discussion of the requisite dollar input is notably brief:

We cannot say that under these circumstances the dollar input per pupil . . . will not be sufficient to offer each pupil an equal educational opportunity as required by the Constitution. [Ante, at 464]

___

[12]The question of adequate dollar input per pupil is inextricably related to the formulation of specific goals and standards discussed *supra* in relation to Article II. Therefore, a determination as to the former must await formulation of the latter. *Robinson IV, supra,* 69 *N. J.* at 162, n. 3 (Pashman, J., concurring and dissenting).

This statement reflects an unfortunate emasculation of the State's responsibility to provide sufficient funds to meet its constitutional obligation, and a concurrent abdication of this Court's duty to oversee the legislative function. The question here is not whether the dollar input levels per pupil *may* be adequate, but whether they *will* be adequate. In *Robinson IV*, Chief Jurtice Hughes reaffirmed the primary importance of this factor by equating the concept of "dollar input per pupil" to that of "expenditure per pupil." 69 *N. J.* at 141.[13]

In *Robinson I* itself, the Court found it unnecessary to establish precisely what level of dollar input per pupil would meet constitutional standards because "[o]n its face the statutory scheme [then under consideration] [bore] no ap-

---

[13] I note that in their separate opinions, the Chief Justice and Judge Conford seem to retreat from this position, asserting now that the sole criterion for judging the constitutional validity of the 1975 Act is whether it produces substantial equalization of tax resources per pupil. *Ante,* at 480–481 (Conford, P. J. A. D., t/a, concurring and dissenting). *Ante,* at 470–471, 473–474 (Hughes, C. J., concurring). Judge Conford argues that this follows from the fact that "[t]he most basic cause of the existing *wide* disparities in expenditure levels is the discordancies in taxable wealth per pupil." *Ante,* at 503. He rejects adequate "dollar input per pupil" as an alternative and equally important criterion on the ground that it is a "symptom" not a "cause" of the constitutional deficiency. *Id.*

In response, I need only note the following: First, even perfect equalization of tax resources may not eliminate *all* of the root "causes" of the current disparities and the constitutional deficiencies in the State's system of public school financing. For instance, absolute equalization of tax resources fails to address the problem of municipal overburden, a problem which everyone admits is a "partial" cause of current inequities. *Ante,* at 494; *Ante,* at 508–509 (Conford, P. J. A. D., t/a, concurring and dissenting); *Robinson IV, supra,* 69 *N. J.* at 150–51; *Robinson I, supra,* 62 *N. J.* at 499, 519; 118 *N. J. Super.* at 273. Second, whether or not "dollar input per pupil" is called a "symptom" or a "cause," it still must be raised to an adequate level in every school district in this State in order to assure that each school district provides that educational opportunity which the Constitution mandates. Finally, the language of our opinions speaks in terms of both "dollar input per pupil" and "equalization of tax resources." *E. g., Robinson I, supra,* 62 *N. J.* at 515–16; *Robinson IV, supra,* 69 *N. J.* at 141.

parent relation to the mandate for equal educational opportunity." 62 *N. J.* at 516. That the statute failed to guarantee adequate levels of per pupil expenditure was equally apparent:

The constitutional mandate could not be said to be satisfied unless we were to suppose the unlikely proposition that the lowest level of dollar performance happens to coincide with the constitutional mandate and that all efforts beyond the lowest level are attributable to local decisions to do more than the State was obliged to do.

Surely the existing statutory system is not visibly geared to the mandate that there be "a thorough and efficient system of free public schools for the instruction of all children in this state between the ages of five and eighteen years." [62 *N. J.* at 516]

The situation before us today differs markedly from that presented in *Robinson I* because the 1975 Act is no longer as clearly and facially inadequate as the Bateman Act with respect to attaining adequate dollar inputs per pupil. Nevertheless, we should not place this Court's imprimatur on a constitutionally suspect statute. Rather, we should defer ruling upon the constitutionality of the equalization support provisions until after an evidentiary hearing has produced factual determinations as to the operational impact of these provisions.

### (2) *Minimum Support* § 18(c) *and Save Harmless Aid* (§§ 55, 56)

Section 18(c) provides that no district shall receive less in current expense equalization support than 10% of the "State support limit." The "save-harmless" provisions assure that no district shall receive less in total State aid for 1976–1977 than it received during the 1974–1975 school year (§ 55), nor less in total State aid for 1977–1978 than one-half of the difference between what it received in 1974–1975 and what it is otherwise entitled to receive in the current year (§ 56).

In *Robinson IV,* we found similar flat grant provisions contained in the Bateman Act to be inconsistent with the

goal of equality of educational opportunity because they left "existing arbitrary ratios of tax resources per pupil unaffected." 69 *N. J.* at 149. In a world of limited resources and serious disparities in the wealth and expenditure levels of local districts, these forms of State aid tend to exacerbate rather than alleviate current inequities. By distributing State aid without regard to need, they at once increase the existing gap between rich and poor districts and reduce the amount of State revenues available to close the gap. Even though they devote only a small percentage of funds to these forms of aid, the minimum aid provisions of the 1975 Act are in one sense even more inequitable than those of the Bateman Act. While under the Bateman Act all districts received minimum aid, under the 1975 Act only those districts which exceed the guaranteed level of valuation do. In light of this factor, I note my disagreement with the Chief Justice's view that "the magnitude" of minimum aid under the 1975 Act is "not such as to require excision." *Ante,* at 472 (Hughes, C. J., concurring). If these provisions are inconsistent with the constitutional mandate, then they must be stricken regardless of their magnitude.

Although I might otherwise argue for invalidation of both the minimum support and save-harmless provisions of the 1975 Act (see, *e. g., Ante,* at 493 – 495 (Conford, P. J. A. D., t/a, concurring and dissenting)), I would prefer to await the results of the plenary hearing on the Act. In all fairness, defendants should be given an opportunity to defend retention of these provisions and to establish that they are consistent with fulfillment of the constitutional mandate. Nevertheless, it is clear that in an educational system which is marked by glaring disparities, it makes little sense to disburse State funds to self-sufficient districts while simultaneously depriving poorer districts of needed assistance. Therefore, if the court below finds that the equalization support provisions of the 1975 Act are inadequate as applied, then it must invalidate the minimum aid provisions as well.

(3) *Categorical Program Support (§ 20) and Transportation Aid (§§ 34, 35)*

Section 20 authorizes distribution of additional State aid to provide for the increased cost of educating handicapped children or those with other special needs. This is accomplished for pupils attending special education classes by assigning additional "weight" for the cost of their education according to a schedule of "additional cost factors." A district's categorical support is calculated by multiplying its number of additional cost units by the State average net current expense budget (§ 20(d)). Under §§ 34 and 35, respectively, the State provides for the full cost of transporting all handicapped children and all other pupils residing beyond a specified distance from school.

Plaintiffs and certain *amici* argue forcefully that, as with minimum support and save-harmless aid, these forms of aid are disbursed without regard to need and, hence, are inconsistent with the goals of eliminating current disparities between school districts. See *Robinson IV, supra,* 69 *N. J.* at 166–67 (Pashman, J., concurring and dissenting).

The majority fails to even recognize this argument.[14] Contrary to its apparent indifference, I find plaintiffs' contention to have some merit. Regardless of the laudable intentions upon which these categorical aid provisions are based, they

---

[14]I observe, on the other hand, that my dissenting Brother does concede that this "argument has a certain plausibility." *Ante,* at 509 (Conford, P. J. A. D., t/a, concurring and dissenting). Nevertheless, he too rejects plaintiffs' contention by finding "colorable reasons, well within legislative policy judgment, for structuring categorical aid along specific rather than equalizing grounds." *Id.,* see also *Ante,* at 473 (Hughes, C. J., concurring). As I previously stated, I do not perceive full equalization of tax resources to be "the sole and absolute criterion of whether the demands of the Education Clause are met." (*Id.*) However, even if it were, no legislative policy, no matter how "colorable," could sustain these provisions if, through their operation, some districts in this State would be unable to provide a constitutionally minimum quality education. Therefore, I would remand for a plenary hearing.

cannot pass constitutional muster if, by their manner of distributing aid, they withdraw sufficient funds from the State's coffers so that the State can no longer assure each district an adequate and equalized level of expenditure per pupil. So long as any school district is underfinanced, no valid legislative purpose is served in distributing this form of State aid in the manner set forth in the 1975 Act. If, however, it can be shown that the equalization support program of the 1975 Act will assure an adequate level of per pupil expenditure for each district in the State, then I would find the constitutionality of the above provisions to be unimpeachable. The facts needed to make this determination, however, are not now before us. For this reason, I would reserve judgment on the constitutionality of these provisions, as well as that of the 1975 Act, until a plenary hearing can determine their operational effect.

### (4) *Elimination of Weighted Pupil Factors as provided for in the Bateman Act*

It is now widely recognized that children from lower socioeconomic level homes often require greater input of educational resources if they are to realize progress comparable to that realized by children from more fortunate backgrounds. *Bateman Report* (1968) at 48. Public education in disadvantaged areas is frequently more expensive due to the greater demand for compensatory education programs. This fact was substantiated by findings of the trial court, 118 *N. J. Super.* at 243, 245, 252–53, 262–63, and repeated by Chief Justice Weintraub in *Robinson I,* where he stated:

> Although we have dealt with the constitutional problem in terms of dollar input per pupil, we should not be understood to mean that the State may not recognize differences in area costs, or a need for additional dollar input to equip classes of disadvantaged children for the educational opportunity. [62 *N. J.* at 520]

The Bateman Act sought to address this concern by assigning additional weight to deprived children for purposes

of calculating the amount of State aid which a district would receive under the act's equalization support provisions. When determining the number of weighted pupils in a given district, children who were recipients of AFDC (aid to families with dependent children) would be given a factor of 1.75 (as compared with the factor of 1 which they otherwise would have been assigned). 118 *N. J. Super.* at 259. In reviewing the constitutionality of the Bateman Act, the trial court found this weighting factor to be one of the most equitable and constitutionally relevant provisions of the act. 118 *N. J. Super.* at 263.

Plaintiffs and *amici* claim that in eliminating the AFDC weighting factor from the 1975 Act, the Legislature has failed to comport with its constitutional obligation. They add that the granting of additional weight to pupils enrolled in bilingual or State compensatory programs under § 20 (0.16 and 0.11, respectively), though intended to deal with the additional cost of educating disadvantaged children, is a poor and constitutionally inadequate substitute for the AFDC provision.

The majority rejects this contention and sanctions the 1975 Act which notably excludes provisions for such underprivileged children. Similarly, my dissenting Brother would relegate this problem to the level of legislative discretion. *Ante,* at 508. (Conford, P. J. A. D., t/a, concurring and dissenting). I must register my strong dissent to both of these approaches. The Constitution requires the State to provide a "thorough and efficient" education to *all* pupils in the State. There is nothing discretionary about this requirement. If it costs more to provide a thorough and efficient education to children in an economically or socially disadvantaged area, then the additional funding must be made available. While the Legislature is not bound to employ an AFDC weighting factor formula or any other predetermined formula, *Robinson IV, supra,* 69 *N. J.* at 145, it may not choose to ignore the problem. Therefore, if the 1975 Act, when viewed in its entirety, fails to assure certain

districts adequate dollar input per pupil because it fails to recognize the additional cost of educating impoverished children, then plaintiffs' objection may reach constitutional dimensions. Hence, as already noted, I would remand for a plenary hearing to determine whether spending levels adequately compensate for these additional costs.

(5) *Use of Prebudget Year in Calculating Allocation of Aid under the Equalization Support, Debt Service and Capital Outlay Provisions*

Plaintiffs and *amici* contend that use of the prebudget year budget in calculating equalization support, debt service and capital outlay grants tends to perpetuate inequities since it fails to account for inflation and it makes State aid dependent upon past expenditures.

Again, the majority fails to address this claim. While I believe that the use of prebudget year budgets is facially reasonable and justified by considerations of administrative convenience, I would not preclude plaintiffs from proving the contrary on remand. For example, it may be that this device, by failing to account for inflation, prevents poorer districts from meeting those levels of per pupil expenditure necessary to provide a thorough and efficient system of education. The use of prebudget year figures is certainly one of the factors which must be examined by the trial court when reviewing the overall operational effect of the 1975 Act.[15]

(6) *State Support Limit*

The "State support" limit is defined *supra* at 540. The purpose of this limitation is to prevent the State from pay-

---

[15] I note that while Judge Conford discusses plaintiffs' claims with respect to use of the prebudget year and imposition of the State Support Limit, *Ante*, at 510–511, he nevertheless would find these provisions to be unimpeachable if tax resources were otherwise equalized. Because equalization of tax resources alone does not necessarily assure full compliance with the educational clause, I must dissent from this approach.

ing its full share of a local school budget (*i. e.*, the share resulting from use of the "State support ratio," see *supra* at 540), where the local budget is considered to be extravagant in terms of per pupil expenditures. The cut-off point is designated as the 65th percentile net expense budget per pupil.

Plaintiffs and *amici* challenge this provision on the ground that when a district's actual needs run above the State 65th percentile of all districts, State aid must be provided on the basis of that district's needs and not be subject to the arbitrary restriction set by the State support limit.

While the majority rejects plaintiffs' challenge by endorsing the 1975 Act, I would, consistent with my approach throughout this case, provide plaintiffs or *amici* the opportunity to prove on remand that the operation of the State support limit does, in fact, prevent one or more school districts from meeting their needs or satisfying standards of performance established pursuant to Article II of the Act.

*(7) Spending Increase Limit (Section 25)*:

Section 25 places a cap on permissible yearly increases in the net current expense budget per pupil. It limits such spending increases in accordance with a stated formula, which treats districts with per pupil expenditure levels below the State average somewhat more generously than districts which are above the State average. In particular, it should be noted that this section inhibits and may even undermine efforts by low-spending districts to equal the per pupil expenditure levels of the higher-spending districts. Consequently, gaps between district current expenditure levels will be closed very slowly.[16] In addition, § 25 makes it particu-

---

[16] I note that the trial court in *Serrano v. Priest*, No. 938,254 (Sup. Ct. L. A. Cty., April 10, 1974) required that within a maximum period of six years disparities between school districts in per pupil expenditures be reduced to "insignificant differences, which means amounts considerably less than $1,000 per pupil." [Memorandum opinion at 102].

larly difficult for low-spending districts to catch up to those districts spending above the State average. Finally, as the majority points out, the intended purpose of this section is unclear. *Ante,* at 466. Therefore, I find this provision to be constitutionally suspect. See also Judge Conford's discussion on this point, *Ante,* at 494–495.[17]

However, since the State may wish to present some countervailing justification for this provision, I would remand this question to the trial court for a determination as to whether § 25 is at all consistent with the goal of a "thorough and efficient" system of education. If it is not, it must be stricken.

### (8) *Municipal Overburden*

The problem of municipal overburden was first identified in the trial court's opinion, 118 *N. J. Super.* at 273, and again in *Robinson I, supra,* 62 *N. J.* at 477, 519. Chief Justice Weintraub, labeling the problem a "critical" factor "in any system of local responsibility," described it as follows:

> One difficulty with the design for local fiscal responsibility is that the tax base to which the school districts are remitted is already overloaded, particularly in the major cities, by the other demands for local service. [62 *N. J.* at 519]

In *Robinson IV* the Court reemphasized the seriousness of

---

[17] I note that the majority and the concurrence find § 25 to be facially constitutional on the grounds that the Commissioner may, under the "escape valve" provision, override the spending limitation when such action is necessary to fulfill the constitutional mandate. *Ante,* at 467; *Ante,* at 473 (Hughes, C. J. concurring). Because full compliance with the education clause — not just facial compliance — is constitutionally mandated, I find the majority's defense of § 25 to be unpersuasive. In any event, as Judge Conford aptly states, "[u]nless the Commissioner is to exercise his power of exemption on a practically wholesale basis, the operation of Section 25 plainly conflicts with the purported object of the act." *Ante,* at 495.

the problem, 69 *N. J.* at 150–51 and, in a separate opinion, I more fully discussed its implications and parameters.[18]

However, at that time, this Court chose not to address the problem — a decision which was attributable to its complexity, the necessity for a quick judicial disposition and the recognition that the Court order was merely an interim remedy and not a final plan. Implicit in the majority's position, however, was the notion that any permanent program for State aid to education ought to account for municipal overburden. The "guaranteed valuation per pupil" formula, as set forth in § 18 of the 1975 Act, fails to do so. Equaliza-

---

[18]In my dissent to *Robinson IV*, I specifically noted:

"There is a third reason why a district, even though it taxes itself heavily, might not be able to raise enough revenues to meet its educational needs. Some areas, particularly urban areas, have exceptionally high non-educational expenses which must be financed through property taxes. Expenses which are exceptionally high in urban areas include county and municipal welfare, police and fire protection, and sanitation. In these areas, revenues raised by property taxes which might otherwise be used for education, must be diverted to non-educational purposes. In addition, a substantial number of municipalities because of their size, density, and special social problems, have quite properly become involved in developing a broad range of public services, particularly in the area of human health and welfare, not provided by other smaller and more affluent communities. This, too, has contributed to the staggering rise in city expenditures, further eroding the one and the same tax base — local real estate ratables.

"Hence a district situated in an area which has a heavy burden of non-education expenses may not be able to meet its educational needs, even though another district with the same property tax base, the same number of weighted pupils, and the same heavy tax rate could do so. The effects of this problem, which has been labeled 'municipal overburden,' on the ability of some urban areas to meet their educational needs is now well documented. *See, e. g., Robinson v. Cahill*, 118 *N. J. Super.* 223, 273 (Law Div. 1972). *Berke, Answers to Inequity*, 82–86 (1974) ; Grubb & Michelson, 'Public School Finance in a Post-Serrano World,' 8 *Harv. Civ. Rights — Civ. Lib. L. Rev.* 550, 564–66 (1973) ; Note, 'A Statistical Analysis of the School Finance Decisions: On Winning Battles & Losing Wars,' 81 *Yale L. J.* 1303, 1314–15 (1972) ; *Coons, Clune & Sugarman, Private Wealth & Public Education*, 233–36 (1970)." [69 *N. J.* at 169–73 (Pashman, J., dissenting and concurring)].

tion of tax resources under that provision will not necessarily guarantee adequate per pupil expenditures in those districts plagued with municipal overburden. Since the overburdened municipality may be unable to obtain adequate funding for that portion of its budget for which the locality is responsible, it may not be able to provide the requisite levels of educational opportunity.

The majority clearly recognizes these facts. However, it disposes of the issue simply by speculating that the problem of municipal overburden "may never occur," since the "State school aid may obviate that predicament," and by advising the Legislature "to address itself to this potential problem." *Ante,* at 466. I cannot concur with this disposition. The Constitution imposes on the State an affirmative duty to provide for a thorough and efficient system of free public schools. Any system of education which falls short of this constitutional command must be rejected. As Chief Justice Weintraub said:

A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command. *Whatever the reason* for the violation, the obligation is the State's to rectify it. If local government fails, the State government must compel it to act, and *if the local government cannot carry the burden* the State must itself meet its continuing obligation. [62 *N. J.* at 513; emphasis supplied]

This statement of our Court is directly relevant to the point at hand. The majority should not discard plaintiffs' admittedly sound contention with respect to municipal overburden on the basis of mere supposition. Instead, the matter should be remanded for a factual determination as to whether the "State school aid" provisions do, in fact, alleviate the problem of municipal overburden or whether that problem remains in spite of the 1975 Act. If the latter is found to be true, then the Act cannot be sustained without some

modification to account for this problem.[19] An idle suggestion that the Legislature address itself to the problem surely will not satisfy the Court's responsibility.

To summarize, the problems and contentions which I have just outlined do not necessarily support the conclusion that any particular provision, or the Act in its entirety, is unconstitutional on its face. The Legislature is free to choose whatever mechanism it deems proper to meet its continuing obligation under the educational clause. *Robinson IV, supra,* 69 *N. J.* at 145. However, in the final analysis, the Legislature's product must provide a thorough and efficient system of free public schools. Any act which falls short of that goal is constitutionally inadequate and, hence, invalid.

---

[19]I note that my dissenting Brother claims that "no specific feasible proposals [have been advanced] as to how a State school-aid formula could fairly and uniformly reflect municipal overburden." *Ante,* at 507.

While measuring municipal overburden with perfect accuracy is certainly a formidable task, there are a number of simple ways of adequately approximating it. 69 *N. J.* at 172. In the present context, the value for the local property tax law used in the equalization support formula of § 18 could be modified to reflect the fact that in some districts much of the apparent tax base is unavailable for financing schools because of the disproportionate noneducational demands made upon it. In particular, the equalized support formula in § 18 could be adjusted by replacing the district equalized valuation per pupil with the equalized valuation per pupil multiplied by the ratio of the percentage of local revenues used for school purposes to the statewide average percentage of local revenues used for school purposes.

Where the necessary information is available, the equalized valuation could be multiplied by the ratio of the local nonschool tax rate to the statewide average local nonschool tax rate. Where one is presented with ratables assessed at less than 100% valuation, the following formula should be used: multiply the district equalized valuation per pupil in the § 18 formula by the quotient of the ratio of the local school tax rate to the total local property tax rate divided by the ratio of the statewide mean school tax rate to the statewide mean property tax rate. *Bateman Report, supra* at 97–98; Grubb & Michelson, "Public School Finance in a Post-Serrano World," 8 *Harv. Civ. Rights — Civ. Lib. L. Rev.,* 550, 562–63 (1973).

In light of the problems and contentions discussed above, the constitutionality of the 1975 Act has clearly been brought into question. While each of the challenged provisions might be able to stand on its own, when viewed together, they raise serious doubts as to whether the 1975 Act is constitutional as applied.

## IV

### REMEDIES AND CONCLUSION

The majority today undertakes a course of action whose implications for the future are problematical and whose bases contradict our prior decisions in this same matter. By sustaining the constitutionality of the 1975 Act, subject, of course, to provision of full funding, the majority embarks upon a path whose uncharted direction can only take us further from those objectives which we posited in *Robinson I*, and to which we have adhered in later adjudications of this case. The covert objective of the majority's mission is not difficult to discern. Essentially, I find its "fresh look" approach to be a euphemistic device for retreating from those fundamental principles which underlie a "thorough and efficient" educational system as defined in *Robinson I–IV*, as for example, the integral correlation between per pupil expenditure levels and quality education.

Contrary to the majority, I am not prepared to review, much less pass judgment on the constitutionality of the Act upon the sketchy record which is now before us. The majority's decision to undertake this determination can only confirm the fragmentary and hypothetical basis upon which it is founded.

Any constitutional confrontation which may have arisen during the course of this litigation has not been undertaken in a spirit of contentiousness or vindictiveness. The decisions which we have rendered have not been written with an eye to impugning either the integrity or good faith of the Governor or the Legislature. The dispositions which we

ordered have not altered the constitutional balance which relies on the fundamental separation of powers. Our incursions from the judicial realm have been marked by a restraint and a reluctance which have often exceeded that warranted by the circumstances.

Nonetheless, the majority today, in a gesture of intergovernmental coexistence, beats a hasty retreat from a position which it had occupied on a different day. In so doing, it leaves a demilitarized zone of discretion to be filled by whatever course of action or inaction the other branches of government choose to follow. In today's decision, the majority suggests that questions of constitutional conformity may be reasonably entrusted to the governmental agencies from whom that conformity is necessary. At another time, it had followed, reluctantly though resolutely, a different route, retaining its function as overseer of constitutional rights. I have found the majority's new position to be unfortunate.

Because I cannot sanction the hasty and ill-considered adjudication undertaken by the majority, I would defer ruling upon the constitutionality of the 1975 Act at this time so that the matter could be remanded for a plenary hearing as to the operational effect and the constitutionality of the 1975 Act. In the meantime, I would retain jurisdiction in order to review the trial court's disposition.

I also take exception to the remedial proposals which the majority presents in Part IV of its opinion. Should the Legislature fail to provide funding in full by *April 6*, the majority would direct, as its first course of action, the redistribution of State aid funds appropriated for the upcoming year in accordance with the equalization provisions of the 1975 Act, §§ 18, 19. The redistribution of such funds would proceed until these provisions were satisfied in full, with any excess funds to be devoted to a *pro rata* satisfaction of the other State aid provisions of the 1975 Act. While I do not question the salutary objective which this relief is intended

to serve, I find the redistribution to be less than a satisfactory resolution of the underlying problem. In fact, to the extent that the redistributed funds would not be directed towards meeting a "thorough and efficient" standard, but would only represent a stop-gap measure, the majority's suggestion is no better than the May 1975 order.

In contrast to the majority, my approach envisions the following possible dispositions for the 1976–1977 school year. If the trial court and/or our Court find the 1975 Act, as implemented, to be constitutional[20] and the Legislature fully funds it before April 15, then the 1975 Act will go into effect for the 1976–1977 school year.

If, however, the Act is held to be constitutional but is not fully funded by April 15, or if the trial court and/or this Court find the Act to be unconstitutional whether or not it is fully funded, our Court should then issue an order to show cause why a remedial order should not be entered. Said order would assure adequate funding of the entire educational system by supplementing those moneys appropriated by the Legislature with the funds to be raised by local school districts in accordance with a fair and equitable formula. It would also determine the formula for the distribution among the school districts of all moneys available for State aid.

Without foreclosing consideration of any other fair and equitable formulae, I would very seriously consider funding on the following terms. The Commissioner of Education would be directed to calculate an average State school tax rate by dividing the total of all school budgets for the entire State (minus any moneys appropriated by the State Legislature) by the total equalized assessed valuation of all

---

[20]This disposition presumes that the trial judge will adhere to the settled judicial principle that if only a few of the Act's provisions are found to be unconstitutional and these few provisions may be severed without altering the Legislature's intended purpose, then the court should sever them in order to preserve the Act's constitutionality.

ratables within the State. Each school district would then be required to raise, through its local school tax, an amount equal to the said average State school tax rate multiplied by the district's equalized assessed valuation. These funds would then be forwarded to the State Treasurer who would distribute them (together with State appropriated funds) according to the amounts required to fully fund each local school budget. Of course, the Commissioner would review each budget, make appropriate revisions and indicate final approval.

This suggested order, which was first anticipated in my dissenting opinion in *Robinson III, supra,* 67 *N. J.* at 41, is both "fair and equitable." Furthermore, it is geared toward implementation of a fully constitutional system of financing public education.

Increased State aid will effectively reduce the school tax rate in all districts.

The power to enter such a remedial order is expressly approved in *Robinson IV,* where Chief Justice Hughes said:

What we have already said is not, of course, to imply that the provisional remedy for the year 1976-1977 we hereinafter order [the May 1975 order] represents our concept of the full reach of our power, duty or responsibility in effectuating the promise of the Constitution to the school children of the State should the other Branches delay action beyond availability of a remedy in time for the school year 1977-1978. [*Robinson IV, supra,* 69 *N. J.* at 146]

See also *Robinson IV, supra,* 69 *N. J.* at 152–53 and cases cited therein.

The Court has the power to obtain funds to finance increases in school expenditures if mandated by the education clause. While *N. J. Const.* (1947), Art. VIII, § II, ¶ 2, may bar the Court from ordering the Legislature to appropriate money or from imposing its own revenue raising measures, *East Orange v. Palmer,* 52 *N. J.* 329, 337–38 (1968); *Fitzgerald v. Palmer,* 47 *N. J.* 106 (1960); *Gallena v. Scott,* 11 *N. J.* 231, 238–39 (1950), that provision does not prevent the

Court from exercising its equitable powers to compel funds to be raised by inferior political subdivisions. *Van Riper v. Board of Chosen Freeholders,* 137 *N. J. L.* 714 (E. & A. 1948); *Hudson County v. Zink,* 135 *N. J. L.* 1 (Sup. Ct. 1946); *cf. Griffin v. County School Board of Prince Edward County,* 377 *U. S.* 218, 84 *S. Ct.* 1226, 12 *L. Ed.* 2d 256 (1964).

The Court also has the power to reallocate moneys appropriated by the Legislature for school purposes so that they may be used constitutionally rather than unconstitutionally. See *East Orange v. Palmer,* 47 *N. J.* 307, 330 (1966); *cf. Mills v. Board of Education of the District of Columbia,* 348 *F. Supp.* 866 (D. D. C. 1972).

This case involves difficult choices and controversial resolutions. The potential unpopularity or controversiality of a decision, however, has been a singularly unpersuasive basis upon which to premise this Court's inaction. *Ridgefield Park v. Bergen County Bd. of Taxation,* 31 *N. J.* 420, 431 (1960); *Robinson III, supra,* 67 *N. J.* at 43 (Pashman, J., dissenting). Not only would such a position represent the abdication of our responsibility to interpret the Constitution, *Robinson IV, supra,* 69 *N. J.* at 154–55, 175 (Pashman, J., concurring in part only and dissenting), but the concurrent emasculation of the State's constitutional promise to provide a "thorough and efficient" education. *Cooper v. Nutley Sun Publishing Co.,* 36 *N. J.* 189, 196–97 (1961); *King v. South Jersey Nat'l Bank,* 66 *N. J.* 161, 177 (1974) (dictum); *Asbury Park Press, Inc. v. Woolley,* 33 *N. J.* 1 (1960); *Robinson IV, supra,* 69 *N. J.* at 153–54 (see cases cited therein), 159 and 173–74 (Pashman, J., concurring in part only and dissenting); *Robinson I, supra,* 62 *N. J.* at 513. The mere suggestion of this sort of resolution must be rejected if for no other reason than for the sake of the thorough and efficient education of almost one and a half million children and their successors.

I continue to believe that every step we take on this highway to a constitutionally thorough and efficient education for all children should bring us closer to a plan which one day would be entirely funded by the State. After the 1875 Amendment to our State 'Constitution, the statewide school property tax paid for 90% of school costs in the State. This surely gave our children something of an equal chance for a public school education. For various reasons connected with statewide equalized tax assessments, we drifted into a formula of apportionment in which ratables rather than pupils constituted the basis for distributing tax proceeds. *Robinson I, supra,* 62 *N. J.* at 508.

We must remain faithful to the tenets enunciated in *Robinson v. Cahill, I, II, III* and *IV.* Having made this commitment, we cannot place our imprimatur on any decision that does not substantially implement the education clause. Deviation from this objective will only perpetuate an educational system which at this writing has permitted four more classes of students to have entered a constitutionally disapproved system and four more classes to have been graduated from it. They surely did not receive the quality education to which they were entitled. I cannot concur in such a result.

Accordingly, I would order the relief which I have outlined in this opinion.

*Concurring*—Chief Justice HUGHES and Justices SULLIVAN, CLIFFORD and SCHREIBER—4.

*Concurring in part*—Justice MOUNTAIN and Judge CONFORD—2.

*Dissenting*—Justice PASHMAN—1.